Hearing Date and Time:  December 22, 2014 at 2:00 p.m.
Objection Deadline Date and Time:  December 15, 2014 at 4:00 p.m.

WHITE & CASE LLP

1155 Avenue of the Americas

New York, New York 10036-2787

Telephone:  (212) 819-8200

Facsimile:  (212) 354-8113

Scott Greissman

Richard A. Graham

Thomas E. MacWright

*Attorneys for Timur Rizabekovich Issatayev*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re | Chapter 15 |
| JSC Alliance Bank, | Case No. 14-13194 (SHL) |
| Debtor in a Foreign Proceeding. | |

**VERIFIED PETITION FOR RECOGNITION OF FOREIGN MAIN PROCEEDING
PURSUANT TO SECTION 1515(a) OF THE BANKRUPTCY CODE
SUPPLEMENTING "VOLUNTARY PETITION" [ECF NO. 1] AND MOTION
FOR RELATED RELIEF PURSUANT TO SECTIONS 105(a), 1507(a), 1509(b)(2)-(3),
1521 AND 1525(a) OF THE BANKRUPTCY CODE GIVING FULL
FORCE AND EFFECT TO RESTRUCTURING PLAN**

Timur Rizabekovich Issatayev (the "Petitioner"), duly appointed by a March 3, 2014

decision (the "Kazakhstan Decision") of the Specialized Financial Court of Almaty City

(together with its legal successor,[1] the "Kazakhstan Court") to act as the foreign representative in

respect of a voluntary restructuring proceeding (the "Kazakhstan Proceeding") under Kazakhstan

law concerning JSC Alliance Bank (the "Bank" or "Debtor"), a joint stock company organized

and existing under the laws of the Republic of Kazakhstan ("Kazakhstan"), by and through his

---

[1] Pursuant to the Decree of the President of the Republic of Kazakhstan dated April 4, 2014, the Specialized Financial Court of Almaty was abolished and its powers were transferred to the Specialized Inter-district Economic Court of Almaty.  Accordingly, although the Kazakhstan Proceeding (as defined below) was initiated in the Specialized Financial Court of Almaty, it is now pending in the Specialized Inter-district Economic Court of Almaty.

undersigned counsel, respectfully submits this verified petition in furtherance of the Form of

Voluntary Petition [ECF No. 1] filed concurrently herewith (collectively herewith, the

"Petition") pursuant to sections 1504 and 1515 of title 11 of the United States Code, 11 U.S.C.

§§ 101-1532 (the "Bankruptcy Code"),[2] for entry of an order:

(i)     recognizing the Kazakhstan Proceeding as the foreign main proceeding in respect of the

        Debtor pursuant to section 1517 of the Bankruptcy Code,

(ii)    granting related relief pursuant to section 1520 of the Bankruptcy Code, and

(iii)   granting further permanent relief pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3),

        1521 and 1525(a) of the Bankruptcy Code in support of the financial restructuring of the

        Debtor through a plan of reorganization in the Kazakhstan Proceeding, if such plan is

        sanctioned by the Kazakhstan Court and the National Bank of Kazakhstan, all in

        accordance with applicable Kazakhstan law.

    In support of the Petition, the Petitioner has filed concurrently herewith and incorporates

herein by reference (a) the Declaration of Timur Rizabekovich Issatayev pursuant to 28 U.S.C. §

1746 (the "Issatayev Declaration")[3] [ECF No. 3][4] and (b) the Declaration of Pavel Kornilov

pursuant to 28 U.S.C. § 1746 (the "Kornilov Declaration") [ECF No. 4], and respectfully

represents as follows:

## PRELIMINARY STATEMENT

    The Debtor, an undercapitalized Kazakhstan bank, has been the subject of a court-

supervised, collective restructuring process under Kazakhstan's bank restructuring legislation

---

[2] Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

[3] The Foreign Representative anticipates filing an additional declaration in advance of the hearing on this Petition to update the Court on a number of events (described in detail below) that are anticipated to occur between the filing of this Petition and such hearing.

[4] A certified copy of the Kazakhstan Decision and an English translation thereof are attached to the Issatayev Declaration as Exhibit A.

over the past eight months.  Following the Debtor's 2010 judicial restructuring in Kazakhstan,[5]

the Bank faced renewed financial difficulties stemming from a material increase in its non-

performing loans and significant outflows of customer deposits.  Even before the commencement

of its current restructuring proceeding, the Bank, its creditors, its regulator, and other interested

parties began negotiating the terms of a plan to restore the Bank to an adequately-capitalized,

properly-functioning financial institution contributing to the growth and development of the local

and regional economies while ensuring that all affected creditors would receive fair and

equitable treatment in respect of their claims.

Such negotiations have resulted in a restructuring plan that has obtained the consent of

over 90% of the voting claims affected thereunder and over 99% of the Bank's voting common

and preference shares.  The restructuring plan envisages participation by all of the Bank's major

stakeholders, including its creditors, its shareholders and its largest depositor, the sovereign

wealth fund of Kazakhstan.  The restructuring plan is premised on the consolidation of the Bank

with two other Kazakhstan banks that is expected to result in important operational, cost and tax

synergies and restoration of the Bank's capital adequacy ratios to the levels required by its

regulator.  The consolidation also significantly decreases the write-offs from existing creditors

and the contributions from the Kazakhstan sovereign wealth fund that would have been

necessary under a stand-alone reorganization.

The Bank has submitted the restructuring plan to the Kazakhstan Court for approval after

a full hearing on the merits in which every affected creditor is entitled to participate.  If approved

by the Kazakhstan Court by the time of the hearing on this Petition (as anticipated), and subject

to the occurrence of the Restructuring Date and the effectiveness of the Termination Order (each

---

[5] As described further below, this Court recognized the Debtor's 2010 Kazakhstan restructuring proceeding as the Debtor's foreign main proceeding in its previous chapter 15 case.  In re JSC Alliance Bank, No. 10-10761 (JMP) (Bankr. S.D.N.Y. Mar. 10, 2010).

as described below), the affected obligations of the Bank will be discharged under Kazakhstan law to the extent they are eliminated under the plan.

By this Petition, the Petitioner seeks the cooperation and assistance of this Court to ensure that no creditors of the Bank are able to circumvent the effects of the restructuring by initiating or continuing actions or proceedings against the Bank, its successors or its property in the United States that are inconsistent with the terms of the restructuring plan, Kazakhstan law, and the objectives of chapter 15 of the Bankruptcy Code.

## BACKGROUND

**A.**    **The Debtor and the Foreign Representative**

1.     The Bank was organized and incorporated[6] under the laws of Kazakhstan in 1993 as an open joint stock company under the name IrtyshBusinessBank OJSC.  Since 1993 it has operated as a bank, accepting deposits and making loans.  In 1999, IrtyshBusinessBank OJSC merged with Semipalatinsk City Bank, another regional bank which was based in Eastern Kazakhstan.  The combined bank primarily served large industrial enterprises in the Eastern Kazakhstan and Pavlodar regions.

2.     In October 2001, a consortium of Kazakhstan companies led by Seimar Alliance Financial Corporation acquired 64% of the issued shares in the Bank.  Following the completion of this transaction, the Bank changed its name to JSC Alliance Bank.

3.     On December 26, 2007, the Agency of the Republic of Kazakhstan for the Regulation and Supervision of Financial Markets and Financial Organizations ("FMSA") issued the Bank its current banking license (No. 250).  The Bank's registration number with the Ministry of Justice of Kazakhstan is 4241-1900-AO, dated March 13, 2004.  The principal place

---

[6] A copy of the Bank's current charter (the "Charter") and a certified English translation thereof are attached to the Issatayev Declaration as Exhibit B.

of the Bank's business, in the sense of decision-making and other head office functions, is its

registered office located at 50 Furmanov Street, Almaty 050004, Republic of Kazakhstan.

4.       The Petitioner is the chairman of the Bank's management board, and the

Kazakhstan Court appointed him foreign representative pursuant to the Kazakhstan Decision

made on March 3, 2014.  The Kazakhstan Decision authorized him both "to carry out the

restructuring of JSC Alliance Bank" and designated him "as a person representing JSC Alliance

Bank for the purpose of any restructuring related procedures initiated by JSC Alliance Bank

outside the Republic of Kazakhstan, including procedures for recognition of the restructuring and

for appointment of the designated person to participate in such procedures."  Kazakhstan

Decision, at 16 (translation).

**B.       The Business of the Debtor**

5.       The Bank is the ninth largest in terms of total assets in Kazakhstan, operating as a

universal financial institution in all business segments but focusing primarily on the retail market

and lending to small and medium-sized enterprises.  As of June 30, 2014, it had a network of 19

branches and 101 cash offices located throughout Kazakhstan.

6.       The overwhelming majority of the Bank's operations and assets (nearly 100% by

value as of June 1, 2014) are located in Kazakhstan.  As of June 30, 2014, the Bank had 3,302

employees within Kazakhstan.  Most of the Bank's directors and executive officers reside in

Kazakhstan.  The Bank wholly owns two currently inactive subsidiaries:  Alliance Finance LLC

(in the Russian Federation) and OUSA Alliance LLC (in Kazakhstan).

**C.       Events Leading to Commencement of the Kazakhstan Proceeding**

**1.       Previous Financial Difficulties and Past Restructuring**

7.       From 2004 to 2007, the Bank expanded rapidly, primarily funded by short term

bank borrowings and debt securities issued in the international capital markets.  The Bank

5

experienced severe liquidity difficulties as a result of the world-wide financial crisis which began

in the middle of 2007.  The Bank also faced a serious deterioration in the quality of its loan

portfolio as Kazakhstan's economic growth slowed.  Further, the Bank suffered a loss of

substantial assets through the fraud of its former management.

8.      By March-April 2009, the Bank was unable to meet its obligations to creditors.  At

this time, having defaulted under a US$ 150 million financing agreement, the Bank suspended

the repayment of all outstanding principal amounts under other agreements.  The Bank also

breached the capital adequacy and liquidity requirements of its then-principal regulator, the

FMSA.

9.      Consequently, the Bank was instructed by the FMSA to initiate negotiations with its

creditors and agreed to enter into an agreement with the FMSA in April 2009 (as amended, the

"FMSA Agreement") concerning the restructuring of the Bank (the "2009 Restructuring").  The

FMSA Agreement imposed certain restrictions on the Bank, and the Bank agreed to develop and

present to the FMSA an indicative restructuring and recapitalization plan by July 15, 2009.

10.      On July 14, 2009, the Bank submitted such indicative restructuring plan to the

FMSA in accordance with the FMSA Agreement, and such plan was approved by the FMSA on

July 21, 2009.

11.      The Kazakhstan Court granted the Bank's application for restructuring in

September 2009, commencing the Bank's first insolvency proceeding (the "2009 Kazakhstan

Proceeding"), which resulted in an automatic stay of all relevant claims of the Bank's creditors

and protection of the Bank's property from execution and attachment until completion of the

2009 Restructuring.  In December 2009, the Bank's financial creditors approved the definitive

restructuring plan (the "2009 Restructuring Plan"), and shortly thereafter, the Sovereign Wealth

NEWYORK 9364446 (2K)

Fund of the Republic of Kazakhstan ("Samruk-Kazyna") acquired 100% of the Bank's common and preference shares.

12.    On February 26, 2010, the Kazakhstan Court issued an order granting final approval to the 2009 Restructuring Plan.

13.    On March 10, 2010, this Court recognized the 2009 Kazakhstan Proceeding.[7] In re JSC Alliance Bank, No. 10-10761 (JMP) (Bankr. S.D.N.Y. Mar. 10, 2010). A copy of the recognition order is attached to the Issatayev Declaration as Exhibit C.

14.    As part of the 2009 Restructuring, the Bank issued securities on March 25, 2010 in an aggregate principal amount of US$ 835,459,252 and KZT 23,522,743,230[8] and entered into a trust deed (the "Trust Deed")[9] with BNY Mellon Corporate Trustee Services Ltd (formerly BNY Corporate Trustee Services Ltd) as trustee (the "Trustee") constituting these securities. Under clause 2.1 thereof, the Bank issued the following securities:

a.    US$ 615,138,114 in principal amount of discount US dollar notes ("Discount Dollar Notes");

b.    KZT 966,814,140 in principal amount of discount tenge notes ("Discount Tenge Notes," together with the Discount Dollar Notes, the "Discount Notes");

c.    US$ 219,343,079 in principal amount of notes repayable at par in dollars ("Par Dollar Notes");

d.    KZT 1,248,534,571 in principal amount of notes repayable at par in tenge ("Par Tenge Notes," together with the Par Dollar Notes, the "Par Notes");

e.    KZT 21,307,394,519 in principal amount of subordinated class B notes denominated in tenge ("Subordinated Tenge B Notes"); and

---

[7] On December 18, 2009, Mr. A. Elleray QC (sitting as a Deputy Judge of the Chancery Division of the High Court of Justice of England and Wales (the "UK Court")) made an order (the "2009 UK Recognition Order") which recognized the 2009 Kazakhstan Proceeding as a foreign main proceeding in accordance with the UNCITRAL Model Law on Cross-Border Insolvency (the "Model Law") as set out in Schedule 1 to the UK Cross-Border Insolvency Regulations 2006.

[8] As of November 20, 2014, one U.S. dollar (US$) was equal to approximately 181 Kazakhstani tenge (KZT).

[9] A copy of the Trust Deed is attached to the Issatayev Declaration as Exhibit D.

NEWYORK 9364446 (2K)

      f.     US$ 978,059 in principal amount of notes entitling their holders to certain distributions out of recoveries or realizations in relation to certain assets, primarily impaired loans and tax credits ("Recovery Notes" and, together with the above other securities, the "Notes," and the holders of the Notes, the "Noteholders").

15.    Pursuant to the Trust Deed, the Bank is obliged to make payments under the Notes on March 25th and September 25th each year until their respective maturity dates.  Additional payments are also due on the Recovery Notes on June 25th and December 25th each year until maturity.

16.    On March 30, 2010, Samruk-Kazyna converted KZT 105 billion (US$ 715 million) of the debt the Bank owed it into convertible preference shares in the Bank and recapitalized the Bank by subscribing for additional common shares for KZT 24 billion (US$ 163 million).[10]  In connection with this restructuring, Samruk-Kazyna, as the Bank's majority shareholder, executed a deed poll wherein it undertook, inter alia, to procure that certain matters could not be approved unless higher thresholds than usually applicable under Kazakhstan law were reached at the relevant general shareholders' meeting or board meeting and that certain matters, which ordinarily could be approved by the Bank's board, would instead require shareholder approval (the "SK Undertaking").

**2.  Renewed Financial Difficulties**

17.    During 2012 and 2013, the financial condition of the Bank deteriorated once more, primarily as a result of a material increase in its non-performing loans (currently, more than 50% of the Bank's loan portfolio is non-performing) and significant outflows of customer deposits (particularly since mid-2013 and continuing in 2014).  In 2013, the Bank's ratings were

---

[10] As of June 30, 2014, Samruk-Kazyna held approximately 51% of the Bank's common shares and KZT 67,100 million of deposits with the Bank.

NEWYORK 9364446 (2K)

downgraded by Fitch and S&P to "C" and "CCC" respectively, which further impaired the

Bank's ability to raise funds and increased its cost of financing.  As of December 31, 2013, as

shown in its audited International Financial Reporting Standards ("IFRS") financial statements,

the Bank had negative equity of some KZT 75 billion, reflecting additional provisions made in

respect of bad loans, de-recognition of some deferred tax assets, deteriorating operating

performance and negative earnings.

18.    Faced with its challenging financial condition, in the last quarter of 2013 the Bank's

management determined to cease making payments into the collection account that funds

payments on the Recovery Notes and, on December 13, 2013, held a meeting in London with

investors to discuss the Bank's financial situation.

19.    The Bank was confronting several challenges to its financial position.  First, its

capital reserves had deteriorated to such an extent that it risked breaching the minimum

regulatory capital adequacy requirements to which it is subject.  Second, due to its decline in

profitability, the Bank had insufficient retained earnings to restore its capital position or to meet

its obligations to creditors, including the Noteholders and Samruk-Kazyna.  Finally, the Bank

anticipated that it would shortly have to suspend making scheduled payments to other creditors

(in addition to the holders of Recovery Notes) in order to preserve its limited liquidity.[11]

20.    On December 26, 2013, as a result of the withholding of payments into the

collection account, the Bank failed to make a payment on the Recovery Notes.

21.    On January 30, 2014, the board of directors of the Bank decided to initiate

restructuring proceedings in Kazakhstan and instructed the Bank's management board to take the

steps necessary to do so.  On February 3, 2014, the National Bank of Kazakhstan (the central

---

[11] Subsequently, on March 25, 2014, the Bank did not pay the interest due and payable on the Discount Tenge
Notes, Discount Dollar Notes, Par Tenge Notes, Par Dollar Notes and Subordinated Tenge B Notes.

bank and current primary financial regulator in Kazakhstan) approved the initiation of the restructuring of the Bank's balance sheet and, on February 6, 2014, the Bank and the Committee for Control and Supervision of the Financial Markets and Financial Organizations of the National Bank of Kazakhstan (the "<u>NBK Committee</u>") executed an agreement to prescribe the negotiation of a restructuring plan.

22.   The Bank engaged White & Case Kazakhstan LLP as its legal advisers and appointed Lazard Frères as its financial advisers in connection with its restructuring.

**D.     <u>Restructuring Financial Institutions under the Laws of Kazakhstan</u>**

23.   Kazakhstan's Restructuring Law[12] came into force on August 30, 2009 and put into place, among other things, a specialized insolvency regime to deal with the restructuring of financial institutions in Kazakhstan.  <u>See</u> Kornilov Declaration at ¶ 8.  As such, it made amendments to Kazakhstan's Civil Procedure Code and its Banking Law,[13] among other laws.  <u>Id.</u>

24.   The Restructuring Law created a new Chapter 6-1 in the Banking Law which deals with the restructuring of banks in the Republic of Kazakhstan.[14]  <u>See</u> Kornilov Declaration at ¶ 9. In essence, that chapter provides for a bank that cannot pay its debts as they fall due and wishes to restructure to submit an application to initiate the restructuring approved by its board of directors along with a draft restructuring plan first, to the National Bank of the Republic of Kazakhstan (which is the "authorized agency" for purposes of the Banking Law) and, second, to the Kazakhstan Court.  <u>Id.</u> at ¶ 11.  Once the decision of the Kazakhstan Court to conduct the

---

[12] As defined in the Kornilov Declaration.

[13] Each as defined in the Kornilov Declaration.

[14] A certified English translation of (i) Chapter 6-1 of the Banking Law and (ii) certain provisions of the Civil Procedure Code relating to the procedural elements of restructuring as introduced by the Restructuring Law is attached to the Kornilov Declaration as Exhibit A.

bank restructuring takes effect, the bank is required to convene a meeting of those of its creditors whose liabilities are to be restructured for the purposes of negotiating and approving the restructuring plan.  Id.  Approval of the restructuring plan requires the consent of at least two-thirds by value of the bank's liabilities to the creditors whose claims are to be restructured.  Id.  Following approval by creditors, the bank is required to submit the restructuring plan to the National Bank of the Republic of Kazakhstan for review and finally to the Kazakhstan Court for approval.  Id.

25.    From the time of the Kazakhstan Court's initial decision to allow the restructuring to proceed, the bank may suspend performance of its outstanding obligations to be restructured, and, under the Civil Procedure Code, both pursuit of claims against the bank and executions upon the property of the bank are suspended.  Kornilov Declaration at ¶ 12.  Once approved by the Kazakhstan Court, the restructuring plan will be implemented.  Id.  After all the measures contained in the restructuring plan are implemented, the restructuring will be terminated by the Kazakhstan Court upon the application of the National Bank of the Republic of Kazakhstan.  Id.  If the Kazakhstan Court orders the termination of a bank's restructuring, as it is entitled to do, on the basis that the actions envisaged in the restructuring plan have been implemented, the bank's liabilities included in the restructuring plan will be considered as fulfilled as a matter of Kazakhstan law, and any enforcement proceedings in relation to decisions of courts and/or tribunals with respect to such liabilities will be terminated.  Id.

26.    Non-Kazakhstan creditors have the same rights to participate in and vote at the creditors' meeting, participate at and raise questions and issues in court hearings and appeal the Kazakhstan Court's orders, if any, as creditors from Kazakhstan.  Kornilov Declaration at ¶ 13.

NEWYORK 9364446 (2K)

E.      **Commencement of the Kazakhstan Proceeding**

27.    On February 25, 2014, the Bank applied for restructuring (the "Restructuring")

pursuant to the Banking Law, attaching a "Draft Plan of Restructuring of Liabilities &

Recapitalization of Alliance Bank" to the application.

28.    As noted, the Kazakhstan Court granted the application in the Kazakhstan Decision

on March 3, 2014, commencing the Kazakhstan Proceeding and appointing the Petitioner as the

person responsible for the Restructuring and as foreign representative in respect of the Bank.

The Kazakhstan Decision resulted in an automatic stay on enforcement of all relevant claims of

the Bank's creditors and protection of the Bank's property from execution and attachment until

completion of the Restructuring.

29.    The Debtor published notice of the Kazakhstan Decision of March 3, 2014 on

March 8, 2014 in both the Kazakh and Russian languages in the papers Yegemen Kazakhstan

and Kazakhstanskaya Pravda, respectively.  In addition, notice was sent directly to the

Correspondent Banks (as defined below) on March 6, 2014.[15]

30.    As part of the Kazakhstan Decision, the Kazakhstan Court ordered that:

> a.      the Restructuring of the Bank must be completed by July 1, 2014
> (although the Bank has obtained an extension of this deadline through January 30,
> 2015[16]);
>
> b.      the Petitioner should be responsible for conducting the Restructuring and
> the creditors' meetings and should preside over the creditors' meetings;

---

[15] Notice was also sent to the following banks where the Bank maintains correspondent accounts outside of the
United States:  Commerzbank AG, Deutsche Bank, OJSC Savings Bank of Russia, OJSC VTB Banks, OJSC
Finance Credit Bank, OJSC PromsvyazBank, OJSC Russlavbank, JSC AB Bank of China Kazakhstan, Subsidiary
Bank of OJSC Savings Bank of Russia, JSC Kazkommertsbank, JSC TemirBank, JSC Bank Centercredit and JSC
BTA Bank.

[16] A certified copy of the order of the Kazakhstan Court extending the deadline to complete the Restructuring and an
English translation thereof is attached to the Issatayev Declaration as Exhibit E.

c.       the Petitioner should be the "foreign representative" for purposes of recognition of the Restructuring and restructuring-related procedures outside Kazakhstan;

d.       the proceeding should be recognized as a judicial proceeding conducted in accordance with the insolvency legislation of the Republic of Kazakhstan in which the Bank's activity is subject to supervision by the National Bank of the Republic of Kazakhstan;

e.       the Bank should undertake various actions to notify and inform its creditors and other interested parties in relation to steps being taken pursuant to the Restructuring, including publishing an information memorandum detailing the debts subject to the Restructuring;

f.       the Bank should duly convene a meeting of the creditors to approve a restructuring plan;

g.       previous court decisions regarding claims against the Bank and the claims of creditors whose liabilities are to be restructured should be suspended; and

h.       execution or attachment upon the property of the Bank is not permitted.

31.     As noted supra in footnote 1, pursuant to the Decree of the President of the Republic of Kazakhstan dated April 4, 2014, the Specialized Financial Court of Almaty was abolished and its powers were transferred to the Kazakhstan Court.  Accordingly, although the Kazakhstan Proceeding was initiated in the Specialized Financial Court of Almaty, it is now pending in the Kazakhstan Court.

## F.       The Restructuring Plan and the Proposed Consolidation

32.     On February 10, 2014, a steering committee of creditors (the "Steering Committee") was formed and on April 7, 2014, was formally appointed by the Bank to conduct restructuring negotiations with the Bank.  The Steering Committee members are Greylock Capital, LIM Advisors, VR Capital, J.P. Morgan and Pioneer Investments.  Houlihan Lokey and Dechert LLP advise the Steering Committee.

NEWYORK 9364446 (2K)

33.    On May 15, 2014, Mr. Bulat Utemuratov ("Mr. Utemuratov"), a Kazakhstan businessman and a major shareholder in a number of Kazakhstan financial institutions, acquired 16% of the common shares and preference shares in the Bank from Samruk-Kazyna.

34.    On August 1, 2014, following several months of negotiations and due diligence by the Steering Committee and its advisors, the Bank and the Steering Committee reached a non-binding agreement on the financial terms of the restructuring of the Bank's liabilities.   The parties recognized that the recapitalization of the Bank on a stand-alone basis would not have been sufficient to restore the Bank's capital to a sustainable IFRS Tier 1 ratio as required by the Bank's regulators.   Moreover, a stand-alone capitalization would have required significantly higher write-offs from existing creditors and increased contribution from Samruk-Zazyna to enable the Bank to operate on a sound basis.   Accordingly, the agreement with the Steering Committee was premised on the integration of the Bank with two other Kazakhstan banks, Temirbank and ForteBank, in each of which Mr. Utemuratov owns the controlling majority interests.[17]

35.    The non-binding agreement reached with the Steering Committee was memorialized in the Bank's definitive restructuring plan (the "Restructuring Plan"), which, as described below, remains subject to approval by the Bank's regulators and the Kazakhstan Court. The key elements of the Restructuring Plan are summarized in the following paragraphs.

### 1.        The Consolidation of the Bank with Temirbank and ForteBank

36.    As noted above, the Restructuring Plan is premised on the Bank's consolidation with two other Kazakhstan banks controlled by Mr. Utemuratov, Temirbank and ForteBank

---

[17] Mr. Utemuratov owns 91.49% of the common shares and 7.61% of the preference shares in Temirbank, and 80.85% of the common shares of ForteBank.  The Petitioner owns the remaining 19.14% of the common shares of ForteBank.  Verny Investments Holding LLP, an investment group founded by the Petitioner, holds all outstanding preference shares of ForteBank. Various shareholders hold the remaining common and preference shares of Temirbank.

(when considered as consolidated with the Debtor, the "Combined Bank").  The primary purpose

of the consolidation is to contribute Temirbank's and ForteBank's capital surplus to the

restoration of the Bank's regulatory capital.  Indeed, as of June 30, 2014, the IFRS Tier 1 ratio of

the Combined Bank on a pro-forma basis would have been approximately 20%–a level

meaningfully above the regulatory minimum and consistent with its main Kazakhstan peers.

Moreover, the Combined Bank will hold a strong competitive position within Kazakhstan's

banking sector.  For instance, as of September 1, 2014, the Combined Bank would have ranked,

on a pro-forma basis, seventh among Kazakhstan's banks by net loans, third by equity, eighth by

total assets and eighth by total deposits.

37.    In addition to creating material cost and operational synergies, the consolidation

will also generate important tax synergies, primarily due to the creation of KZT 19.5 billion in

deferred tax assets and the ability to use the Bank's existing off-balance sheet deferred tax

attributes.  Moreover, the partial use of such deferred tax attributes will result in no tax being

payable on the Bank's restructuring gain resulting from the Restructuring Plan in 2014 (which

represents an approximate aggregate tax savings of KZT 12.5 billion that would likely not have

been available in the absence of the consolidation).  The consolidation is also expected to

improve the Combined Bank's financial profile and future profitability, thus allowing for the use

of additional deferred tax attributes.  While the Combined Bank will face material upfront

integration costs of the consolidation, such as increased network and information technology

expenditures, such costs are expected to be offset by overall synergies within three years of the

closing of the consolidation.

NEWYORK 9364446 (2K)

2.        **The Equity Interests in the Combined Bank**

38.    The Bank, Temirbank and ForteBank will be consolidated into the Combined Bank at their respective book values of equity, as adjusted to reflect each bank's contribution of tax attributes to the Combined Bank.  Under this proposed structure, shareholders of Temirbank are expected to receive 64.24% of the Combined Bank's common shares, shareholders of ForteBank are expected to receive 25.42% of the Combined Bank's common shares, and (mostly new) shareholders of the Bank are expected to receive 10.34% of the Combined Bank's common shares and 100% of the Combined Bank's preferences shares.

39.    As a result, the proposed shareholdings of the Combined Bank as of the closing of the Restructuring (as calculated as of October 13, 2014) are expected to be: (i) Mr. Utemuratov owning 76.47% of the common shares and 20.02% of the preference shares, (ii) the claimants of the Bank owning 10.32% of the common shares (as described in the next paragraph); (iii) the Petitioner owning 4.68% of the common shares, (iv) Samruk-Kazyna holding .01% of the common shares and 51.00% of the preference shares, and (v) other shareholders of Temirbank and ForteBank holding the remaining minority of common shares.  Existing shareholders of the Bank are expected to have their common shares diluted below .01% and to own 28.98% of the preference shares.

40.    Pursuant to the Restructuring Plan, the common shares available to claimants of the Bank (i.e., 9,966,484,918 common shares in the Combined Bank or approximately 10.3% of the Combined Bank's common shares on a pro-forma basis as of June 30, 2014) will be made available to holders of Discount Notes, Par Notes and Subordinated Tenge B Notes.  The holders of such Notes may, subject to certain exceptions, elect to receive global depository receipts ("GDRs") instead of common shares in the Combined Bank.  One such GDR is expected to

represent 500 common shares, which shares will be transferred to and held by a depositary on the GDR holders' behalf.

41.     Claimants of the Bank receiving shares or GDRs in the Combined Bank under the Restructuring Plan will benefit from minority shareholder rights, including tag-along rights in respect of share disposals of Mr. Utemuratov, the right to nominate an independent director with a clear majority of GDR holders and protections under Kazakhstan law, such as protective requirements for related-party transactions, mandatory offer rules and a requirement for one-third of the board of directors to consist of independent directors.

**3.       The New Senior Notes**

42.     Pursuant to the Restructuring Plan, in addition to their distributions of common shares, holders of Discount Notes and Par Notes will receive new 10-year senior notes issued by the Combined Bank (the "New Senior Notes") in the total nominal amount of US$ 236,570,000, with an annual 11.75% coupon payable in cash semi-annually.  Principal on the New Senior Notes will be paid in 16 semi-annual installments starting on the date 30 months after closing. The New Senior Notes will be governed by English law and listed on the Kazakhstan and Luxembourg Stock Exchanges.

**4.       Elections Available to Noteholders**

43.     Pursuant to the Restructuring Plan and subject to certain limitations, holders of Par Notes, Discount Notes and Subordinated Tenge B Notes may elect to exchange all or a part of their equity consideration for New Senior Notes or vice versa.  Moreover, holders of Par Notes, Discount Notes and Subordinated Tenge B Notes may elect to exchange all or a portion of their equity consideration for cash.  The amount of equity eligible for such cash exchange will be limited to 40% of the overall equity allocated to the existing holders of Par Notes, Discount

Notes and Subordinated Tenge B Notes.  Subject to the above limit, electing holders of

Subordinated Tenge B Notes will be allocated cash for their equity on a priority basis.

### 5.    Cash Payments

44.    Holders of Discount Notes, Par Notes and Recovery Notes will also receive certain

other cash distributions as provided for in the Restructuring Plan.

### 6.    The Samruk-Kazyna Deposits

45.    The Restructuring Plan also calls for a contribution by Samruk-Kazyna of special

term deposits in the amount of KZT 220 billion (i.e., approximately US$ 1.22 billion) (the "New

SK Deposit"). The New SK Deposit has a 10-year maturity with a bullet repayment and bears a

4% interest rate with interest paid in cash semi-annually. Samruk-Kazyna's contribution will be

accomplished primarily through the conversion of its deposits at the Bank, Temirbank and

ForteBank.  Holders of the New Senior Notes will be protected against an early withdrawal of

Samruk-Kazyna's deposits by a covenant in the documents governing the New Senior Notes.

### G.    Creditor and Shareholder Plan Approval Process

### 1.    The Information Memorandum

46.     The Bank published an information memorandum dated October 13, 2014, in

connection with the restructuring (as amended and supplemented, the "Information

Memorandum").  The Information Memorandum is attached to the Issatayev Declaration as

Exhibit F.  The Bank's proposed Restructuring Plan is set forth in Schedule 1 to the Information

Memorandum beginning at page 178 and is attached to the Issatayev Declaration as Exhibit G.

The Information Memorandum contains a detailed presentation of the terms of the Restructuring

Plan, the risk factors associated with the Restructuring Plan, the proposed consolidation of the

Bank with Temirbank and ForteBank, and a description of all procedures to be taken by the

Bank's creditors and shareholders to approve (or disapprove) the Restructuring Plan and the

consolidation.  The Information Memorandum was made available to interested parties (subject

to certain limitations arising from applicable securities laws) on the Bank's website.

### 2.    The Claimants' and Noteholders' Meetings

47.    A meeting of creditors whose debts are being restructured under the Restructuring

Plan (such creditors, the "Claimants," such claims, the "Claims," and such meeting, the

"Claimants' Meeting") was held on November 19, 2014.  In accordance with Kazakhstan law,

the Claimants attending the Claimants' Meeting (either in person or by proxy) voted, as a single

class, on whether to approve the Restructuring Plan.  The Claimants overwhelmingly approved

the Restructuring Plan by 90.5% of the amount of Claims voted at such meeting.  Thus, the

voting results on the Restructuring Plan far surpassed the creditor consent threshold of two-thirds

(2/3) of all Claims voted required under Kazakhstan law.  See Kornilov Declaration at ¶ 11.

48.    Prior to the Claimants' Meeting, each series of Notes issued by the Bank held its

own respective meeting (each a "Noteholders' Meeting") regarding the approval of the

Restructuring Plan.  Such Noteholders' Meetings were convened on October 31, 2014 but were

adjourned until November 14, 2014 for failure to satisfy the quorum thresholds set forth in the

Trust Deed.

49.    At each adjourned Noteholders' Meeting, the beneficial holders of the respective

series of Notes were asked to consider and, if thought fit, pass (either in person or by proxy

through a direction to the clearing systems or their applicable custodians or securities brokers) an

extraordinary resolution in respect of such series (each an "Extraordinary Resolution"), that,

among other things, instructed the Trustee for such series of Notes to vote the full amount of the

claims with respect to such series at the Claimants' Meeting in favor of the Restructuring Plan.[18]

---

[18] As explained further below, the Extraordinary Resolution also authorizes the Trustee, upon approval of the
Restructuring Plan by the Kazakhstan Court, to, among other things, release the Bank and Samruk-Kazyna and

Pursuant to the Trust Deed, the Extraordinary Resolution with respect to a series of Notes required (i) the affirmative vote of 75% of the nominal amount of such Notes voting at the Noteholders' Meeting and (ii) that the applicable quorum has been satisfied (i.e., 75% of the outstanding Notes at the first Noteholders' meeting or 25% of the outstanding Notes at the adjourned Noteholders' Meeting).  To the extent an Extraordinary Resolution was not adopted, the votes of the Noteholders in such series were treated as individual Claimants' votes for purposes of the voting on the Restructuring Plan at the Claimants' Meeting.

50.    At the adjourned Noteholders' Meetings, the voting holders of Tenge Discount Notes, Dollar Discount Notes, Dollar Par Notes and Recovery Notes authorized the respective Extraordinary Resolutions with 100%, 97.1%, 99.2% and 99.0% (by amount) voting in favor. Accordingly, the Trustees for such tranches of Notes voted the full principal amount of such Notes in favor of the Restructuring Plan at the Claimants' Meeting.

51.    The holders of Subordinated Tenge B Notes did not pass the Extraordinary Resolution at their Noteholder Meeting. (Noteholders holding 34.7% in principal amount of the Notes voting at such meeting voted in favor of the Extraordinary Resolution and 65.3% against.) As a result, the Trustee for the Subordinated Tenge B Notes did not vote at the Claimants' Meeting, and the votes cast by holders of Subordinated Tenge B Notes at the adjourned Noteholders' Meeting in favor of or against the Extraordinary Resolution were automatically deemed to be voted in favor of or against the Restructuring Plan at the Claimants' Meeting according to how they were cast at their Noteholders' Meeting.

---

certain other third parties with respect to the liabilities restructured under the Restructuring Plan, the SK Undertaking and the implementation of the Restructuring Plan.

NEWYORK 9364446 (2K)

52.    No holders of Tenge Par Notes appeared or voted at the adjourned Noteholders' Meeting.  As a result, no holders of the Tenge Par Notes were deemed to have voted at the Claimants' Meeting, and no such holders otherwise voted at the Claimants' Meeting.

53.    Notice of the Claimants' Meeting was set out at Schedule 3 of the Information Memorandum at page 192.  Notices of the Claimants' Meeting were published in the <u>Financial Times</u> (in English) on October 14, 2014, <u>The Wall Street Journal</u> (in English) on October 15, 2014, <u>Kazakhstanskaya Pravda</u> (in Russian) on October 18, 2014, and <u>Yegemen Kazakhstan</u> (in Kazakh) on October 18, 2014.  Notice of such meeting was also sent to the Kazakhstan Stock Exchange on October 17, 2014 and posted on the Bank's corporate website on October 13, 2014.

54.    The owners of the Notes were also notified of the Noteholders' Meetings through notices distributed through Euroclear and Clearstream.  The notices of the Noteholders' Meetings included a reference to the Information Memorandum which, in turn, included notice of the Claimants' Meeting.  Notices of the Noteholders' Meetings are set out in Schedule 5 of the Information Memorandum at pages 196-256.

**3.    Shareholder Approvals**

55.    A joint general shareholders' meeting of the Bank, Temirbank and ForteBank was held on November 10, 2014, wherein the shareholders of the Bank approved the Restructuring Plan, and shareholders of each respective bank approved the proposed consolidation of the three banks and other ancillary matters necessary for the completion of the Restructuring and consolidation.  The resolution approving the Bank's Restructuring Plan was passed by 99.74% of the voting common shares and preference shares of the Bank.[19]  The resolution approving the proposed consolidation of the three banks was passed by 99.98%, 100% and 100% of the voting

---

[19] In accordance with applicable Kazakhstan law, the holders of preference shares and common shares voted as a single class, with each share having one vote.

shares of the Bank, ForteBank and Temirbank, respectively.[20]   Shareholders at the joint general

shareholders' meeting were permitted to vote in person or by proxy.  Notices of such meeting

were published on the website of the Kazakhstan Stock Exchange and the corporate websites of

the Bank, Temirbank and Fortebank on October 10, 2014.  The Bank of New York Mellon, in its

capacity as the GDR depository, also sent a proxy form to shareholders holding GDRs and

initiated a corporate event in the clearing systems with respect to the shareholders' meeting.

Further, such form of notice of shareholders' meeting is set out in Schedule 6 of the Information

Memorandum at pages 257-258.

**H.**          **Regulatory and Court Approval Process**

56.    On November 20, 2014, the Bank submitted the Restructuring Plan to the National

Bank of Kazakhstan for its approval and a determination that it is consistent with the indicative

restructuring recapitalization plan initially considered by the National Bank of Kazakhstan on

March 3, 2014.  The Bank has submitted the proposed consolidation to the Kazakhstan

competition agency for its approval.  The National Bank of Kazakhstan and the Kazakhstan

competition agency are each expected to rule on the approval of the Restructuring Plan and the

proposed consolidation by December 11, 2014.

57.    The Kazakhstan Court's final hearing regarding whether to approve the

Restructuring Plan is scheduled for December 11, 2014, and a notice thereof will be given on or

about November 20, 2014 by publication of a press release on the Bank's website and on the

website of the Kazakhstan Stock Exchange.  In addition, the Bank will email the press release to

the email addresses of the Trustee (with the request that it be sent through the clearing systems to

---

[20]   Pursuant to the Bank's charter, some of the resolutions requested of the shareholders of the Bank required at least
75% of voting shares.  Moreover, pursuant to the SK Undertaking, the resolutions approving the Restructuring Plan,
the consolidation and the amendment to the SK Undertaking required the consent of at least four shareholders
holding at least 75% of the Bank's common shares, which approval was in each case obtained.

NEWYORK 9364446 (2K)

Noteholders) and to Samruk-Kazyna.  All Claimants are allowed to submit written objections

and evidence and to be heard at the final hearing.  If the Kazakhstan Court decides to approve the

Restructuring Plan (such decision, the "<u>Approval Decision</u>"), parties in interest opposed to such

decision would be afforded an opportunity to appeal the decision.  If the Restructuring Plan is

approved by the Kazakhstan Court, the Bank intends to issue common shares to shareholders of

Temirbank and ForteBank in accordance with the Restructuring Plan and receive transferred

shares in Temirbank and ForteBank on December 12, 2014, and to distribute Entitlements

beginning on December 15, 2014.

## I.        **Effect of the Approval Decision**

58.    Upon the Kazakhstan Court issuance of the Approval Decision, the Restructuring

Plan will become binding on Claimants and the Bank.  Restructuring Plan at §§ 2.1 and 2.4.

Upon the Steering Committee notifying the Bank that the conditions precedent to the

Restructuring Plan becoming effective have been satisfied (the date on which this occurs, the

"<u>Restructuring Date</u>" or the "<u>Release Date</u>"), the Restructuring Plan will be implemented and

Claimants will receive any distributions (the "<u>Entitlements</u>") to which they are entitled under the

Restructuring Plan.  Restructuring Plan at § 2.7.

59.    On the Release Date, all debts and Claims held by Samruk-Kazyna and the Notes

that issued Extraordinary Resolutions will be discharged and/or cancelled.  Restructuring Plan at

§ 3.1(a).

60.    In consideration for the Entitlements provided by the Bank and the contributions by

Samruk-Kazyna to the Bank contemplated under the Restructuring Plan, the Restructuring Plan

also provides for Claimants to affirmatively release their Claims against the Bank as well as

claims against certain third parties with the mechanisms for doing so differing among the

different categories of Designated Financial Indebtedness (as defined in the Information

Memorandum).

61.    Clause 3.5 of the Restructuring Plan sets out the release mechanisms for

Noteholders.  For those holders of a series of Notes that passed an Extraordinary Resolution in

accordance with the terms of the Trust Deed (which is governed by English law), the Trustee

will be authorized and directed, from the Restructuring Date, to execute a deed of release (the

"Deed of Release") on behalf of all Noteholders of those series.  Restructuring Plan at § 3.5(a).

As noted above, the holders of Dollar Discount Notes, Tenge Discount Notes, Dollar Par Notes

and Recovery Notes each approved such Extraordinary Resolutions on November 14, 2014.

Accordingly, purely as a matter of English contractual law, the Trustees for such series of Notes

will execute the Deed of Release on behalf of all such Noteholders on the Restructuring Date.

62.    Where holders of a series of Notes did not pass an Extraordinary Resolution (as was

the case for the Subordinated Tenge B and the Tenge Par Notes), the Restructuring Plan

contemplates that, in order to be eligible to receive Entitlements in accordance with the

Restructuring Plan, the relevant Noteholders will be required to approve an Extraordinary

Resolution at a separate meeting of Noteholders, cancelling the relevant series of Notes and

authorizing the Trustee to enter into the Deed of Release on behalf of such Noteholders.

Restructuring Plan at § 3.5(b)(i).  Noteholders of such series that fail to do so within three years

from the Restructuring Date will lose their rights to Entitlements under the Restructuring Plan.

Restructuring Plan at § 3.2(d).  However, such Noteholders will retain their rights vis-à-vis the

Released Parties (as defined below) other than (i) the Bank and (ii) Samruk-Kazyna with regard

to liabilities relating to the SK Undertaking.[21]

---

[21] Pursuant to the resolution passed by the Banks' shareholders at the joint general shareholders' meeting, the
majority of the provisions of the SK Undertaking have been terminated pursuant to the terms of that agreement.  As

NEWYORK 9364446 (2K)

63.     The release mechanism for Samruk-Kazyna is outlined in Clause 3.6 of the

Restructuring Plan.  Such clause contemplates that, in respect of the SK Deposits, Samruk-

Kazyna will execute a separate Deed of Release prior to the Restructuring Date in order to

receive its Entitlements under the Restructuring Plan.  Samruk-Kazyna expressed its support for

the Restructuring Plan by filing a Claim Form and a Proxy Form instructing the Chairman of the

Claimants' Meeting to vote in favor of the Restructuring Plan on its behalf.

64.     The Deed of Release delivered by the respective Trustees for the Notes and

Samruk-Kazyna releases, with effect from the Release Date, (i) the Bank, (ii) the Bank's

subsidiaries, (iii) Samruk-Kazyna, (iv) the officers and directors of the Bank and Samruk-

Kazyna, (v) the Steering Committee and (vi) the financial and legal advisors of the Bank and the

Steering Committee (collectively, the "Released Parties") from all claims and liabilities the

Trustees, the releasing Noteholders or Samruk-Kazyna may have, whether in law or equity,

against each and all of the Released Parties arising out of or in connection with the Designated

Financial Indebtedness and/or the SK Undertaking and/or the implementation of the

Restructuring, except for any liabilities involving gross negligence, fraud or wilful misconduct.

The form Deed of Release is attached to the Information Memorandum at page 185.

**J.          Effect of the Kazakhstan Court order terminating the Kazakhstan Proceeding**

65.     Once the Restructuring Date has occurred, the Bank will report this to the National

Bank of the Republic of Kazakhstan, which in turn will apply to the Kazakhstan Court to

terminate the Kazakhstan Proceeding.  If the Kazakhstan Court enters an order terminating the

Kazakhstan Proceeding (such order, the "Termination Order"), which it is entitled to do if

---

a result, only the tag-along rights contained in that agreement remain outstanding for so long as Samruk-Kazyna owns shares in the Bank.  In consideration for the New SK Deposit that Samruk-Kazyna is providing the Bank under the Restructuring Plan (i.e., long-term deposits exceeding US$1 billion), the SK Undertaking will be terminated in full and Samruk-Kazyna and all other persons will be released from any liability to the Claimants thereunder. Restructuring Plan at § 6.

NEWYORK 9364446 (2K)

actions envisaged by the Restructuring Plan have been accomplished, then, upon the Termination

Order coming into force (such date, the "Effective Date"), the Bank's liabilities included in the

Restructuring Plan will be considered as fulfilled as a matter of Kazakhstan restructuring law (as

distinguished from the contractual release of the Bank and the Released Parties under the Deed

of Release), and enforcement proceedings in relation to decisions of courts, arbitration and

referee tribunals on such liabilities shall be deemed terminated by operation of the Banking Law.

Kornilov Declaration at ¶ 12.  Under Kazakhstan law, the Termination Order will come into

force after a 15 day appeal period has passed.  Id.  Essentially any party in interest may object to

entry of, or appeal the relief granted in, the Termination Order.  Id.

66.    Claimants are also obliged to discontinue any proceedings against the Bank to

recover or to establish the amounts or existence of any Designated Financial Indebtedness.

Restructuring Plan at § 3.7.

67.    While Kazakhstan law does not provide for a stay of actions relating to restructured

debt upon termination of the restructuring proceedings, the above provisions of the Restructuring

Plan mean that former creditors whose debts were subject to the Restructuring Plan will no

longer be able to bring successful actions in Kazakhstan in relation to such debts, as they will

have been discharged, and enforcement of existing judgments in relation to them will be

prohibited.  Kornilov Declaration at ¶ 12.

68.    The Restructuring Plan itself does not become binding upon creditors who did not

submit Claim Forms in the Kazakhstan Proceeding until the Effective Date, at which point the

claims of all creditors of the Bank whose claims against the Bank were subject to the

Restructuring Plan, including those of creditors who did not submit Claim Forms, are discharged

by operation of law.

Pg 27 of 61

**K.**      **Connections to the United States and the Need for Chapter 15 Relief**

69.    Although the Bank has no branch, agency or other place of business, or directors, officers or employees in the United States, the Bank does have correspondent accounts (the "Correspondent Accounts") located in New York County, New York with the Bank of New York Mellon, JPMorgan Chase & Co. and Deutsche Bank Trust Company Americas (the "Correspondent Banks").  The Correspondent Accounts have been established for many years, and the Bank makes payments through its Correspondent Accounts in the ordinary course of its day-to-day banking business.  The balances of the Correspondent Accounts fluctuate frequently as business is transacted, but as of the date hereof, the Correspondent Accounts had a total aggregate balance of over US$ 5,000,000.

70.    The Bank maintains a website which is accessible from the United States and has identified a process agent in New York for purposes of the USA Patriot Act, namely CT Corporation System.  Further, the Bank believes certain of its financial creditors are financial institutions located in the United States, and a small number of the Bank's depositors are residents of the United States.

71.    The purpose of the relief requested in this Petition is to ensure that creditors of the Bank (or those claiming through them) are not able to use American courts to circumvent the effect of the Kazakhstan Proceeding and the Restructuring Plan approved by the Kazakhstan Court, for example by seeking to attach and garnish funds in the Correspondent Accounts.  Though the Bank is not now a party to any litigation in the United States and the Petitioner is unaware of any specific threats, obtaining this Court's recognition of the Kazakhstan Proceeding, together with the related relief requested herein, will likely be critical to the success of the Restructuring, including implementation of the Restructuring Plan.

NEWYORK 9364446 (2K)

72.     While the Petitioner is not at this time seeking provisional relief, he reserves his

right to do so.

**L.      Ancillary UK Proceeding**

73.     The Bank also has various links to the United Kingdom.  Among other things, the

Notes (which constitute a major part of the Designated Financial Indebtedness) are governed by

English law.  Moreover, the Trust Deed in respect of the Notes is also governed by English law,

and disputes related to it may be referred to arbitration before the London Court of International

Arbitration in London.  The Bank also maintains correspondent accounts with banks in the

United Kingdom.

74.     To protect the Bank's assets in the United Kingdom, the Petitioner obtained an

order (the "UK Recognition Order") from the UK Court dated April 29, 2014, recognizing the

Kazakhstan Proceeding as a foreign main proceeding in accordance with the Model Law as set

out in Schedule 1 to the UK Cross-Border Insolvency Regulations 2006, and granting a stay

under Article 20(1) of Schedule 1 to the Cross-Border Insolvency Regulations 2006.  A copy of

the UK Recognition Order is attached to the Issatayev Declaration as Exhibit H.  The Bank is

also seeking an order from the UK Court granting a permanent stay of actions or proceedings or

executions against the assets of the Bank in relation to claims based on or arising out of or in

connection with the Designated Financial Indebtedness being restructured, such stay to continue

notwithstanding the termination of the restructuring proceedings pending with respect to the

Bank in Kazakhstan.

## JURISDICTION, ELIGIBILITY AND VENUE

75.     This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157(a)

and 1334 and the Amended Standing Order of Reference dated January 31, 2012, Reference M-

431, In re Standing Order of Reference Re:  Title 11, 12 Misc. 00032 (S.D.N.Y. Feb. 2, 2012)

NEWYORK 9364446 (2K)

(Preska, C.J.).  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2)(P),

and the Court may enter a final order in respect of it under Article III of the United States

Constitution.

76.    This case has been properly commenced pursuant to section 1504 of the Bankruptcy

Code by the filing of the Petition for recognition of the Kazakhstan Proceeding under section

1515 of the Bankruptcy Code.

77.    The Petitioner is eligible for chapter 15 relief in respect of the Debtor.  The Debtor

has "property in the United States" in the form of funds in the Correspondent Accounts.  See 11

U.S.C. §§ 109(a) (establishing presence of property as a basis for debtor eligibility); see also

Drawbridge Special Opportunities Fund LP v. Barnet (In re Barnet), 737 F.3d 238, 248-50 (2d

Cir. 2013); In re Octaviar Admin. Pty Ltd, 511 B.R. 361, 372-373 (Bankr. S.D.N.Y. 2014)

(holding cash in client trust account maintained by the foreign representatives' U.S. counsel

satisfied the section 109(a) requirement).   Though a bank, the Debtor has no branch, agency or

other place of business in the United States and is thus within the scope of application of chapter

15.  See 11 U.S.C. §§ 109(b)(3)(B) (excluding foreign banks with branches or agencies in the

United States), 1501(c)(1) (establishing chapter 15 scope of application by reference to section

109(b) exclusions).

78.    Venue is proper in this district.  Section 1410 of title 28 of the United States Code

provides as follows:

> A case under chapter 15 of title 11 may be commenced in the district court of the
> United States for the district—
>
> (1)      in which the debtor has its principal place of business or principal
> assets in the United States;
>
> (2)      if the debtor does not have a place of business or assets in the
> United States, in which there is pending against the debtor an action or
> proceeding in a Federal or State court; or

NEWYORK 9364446 (2K)

(3)        in a case other than those specified in paragraph (1) or (2), in which venue will be consistent with the interests of justice and the convenience of the parties, having regard to the relief sought by the foreign representative.

79.    The Debtor's principal U.S. assets, the Correspondent Accounts, are located in this District.

## RELIEF REQUESTED

80.    The Petitioner requests that this Court enter an order, substantially in the form of the proposed order attached hereto as Exhibit A, pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1515, 1517, 1520, 1521 and 1525(a) of the Bankruptcy Code that:

a.    recognizes the Kazakhstan Proceeding as the "foreign main proceeding" (as defined in section 1502 of the Bankruptcy Code) in respect of the Debtor and the Petitioner as the "foreign representative" (as defined in section 101(24) of the Bankruptcy Code) in respect of the Kazakhstan Proceeding;

b.    grants all of the relief afforded to foreign main proceedings pursuant to section 1520 of the Bankruptcy Code;

c.    entrusts the Petitioner with the administration, realization and distribution of any and all of the Debtor's assets within the territorial jurisdiction of the United States and authorizes him to examine witnesses, take evidence, and deliver information concerning the Debtor and its business;

d.    provides that, as of the Effective Date, the Restructuring Plan, Approval Decision, and Termination Order are recognized, granted comity, entitled to full force and effect, and enforceable against all entities (as that term is defined in section 101(15) of the Bankruptcy Code) in accordance with their terms and that such terms shall be binding on the Debtor and all Claimants, as well as their respective heirs, successors, assigns, trustees, subsidiaries, affiliates, officers, directors, agents, employees, representatives, attorneys, beneficiaries, guardians and similar officers, or any person claiming through or in the right of such person or entity (collectively, the "Related Parties") whether or not any such Related Party actually agreed to be bound by the Restructuring Plan or participated in the Kazakhstan Proceeding;

e.    provides that, as of the Effective Date, any judgment, wherever and whenever obtained, to the extent such judgment is a determination of the personal liability of the Bank or its successor(s) in interest with respect to any debt cancelled, discharged or restructured under the Restructuring Plan and/or as a result of Kazakhstan law relating to the restructuring of the Bank, is unenforceable in the United States, provided however, that if such debt is restructured under the Restructuring Plan and

NEWYORK 9364446 (2K)

such law, the enforceability of such judgment is impaired by such order only to the extent it is inconsistent with the Restructuring Plan and such law;

f.   permanently enjoins, as of the Effective Date, all Claimants and Related Parties from commencing or continuing in any manner, directly or indirectly, including by way of counterclaim, any action, suit or other proceeding (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), employing any process, or performing any act, in each case within the territorial jurisdiction of the United States, to collect, recover or offset (except as expressly provided in the Restructuring Plan) any debt cancelled, discharged or restructured under the Restructuring Plan and/or as a result of Kazakhstan law relating to the restructuring of the Bank, provided however, that if such debt is restructured under the Restructuring Plan and/or such law, such injunction applies only to the extent that commencing or continuing such action, employing such process or performing such act is inconsistent with the Restructuring Plan and/or such law;

g.   permanently enjoins, as of the Effective Date, all Claimants and Related Parties from commencing or continuing any action (including, without limitation, arbitration, mediation or any judicial, quasi-judicial, or administrative action, proceeding or process whatever in any judicial, arbitral, administrative or other forum), including by way of counterclaim, employing any process, or performing any act, to collect, recover or offset (except as expressly provided in the Restructuring Plan) any debt cancelled, discharged or restructured under the Restructuring Plan and/or as a result of Kazakhstan law relating to the restructuring of the Bank, against property of the Bank or its successor(s) in interest within the territorial jurisdiction of the United States, including (i) enforcing, levying, attaching (including any prejudgment attachment), collecting or otherwise recovering by any manner or means, whether directly or indirectly, any judicial, quasi-judicial or administrative judgment, award, decree, determination, assessment or order against the Bank or its successor(s) in interest or such property, or any direct or indirect transferee of or successor to any property of the Bank, or any property of such transferee or successor, or (ii) creating, perfecting or otherwise enforcing in any manner, directly or indirectly, any lien or encumbrance of any kind against such property, provided however, that if such debt is restructured under the Restructuring Plan and/or such law, such injunction applies only to the extent that commencing or continuing such action, employing such process or performing such act is inconsistent with the Restructuring Plan and/or such law;

h.   permanently enjoins, as of the Effective Date, all Claimants and Related Parties from (i) transferring, relinquishing or disposing of any property of the Bank, or of any direct or indirect transferee of or successor to any property of the Bank, or any property of such transferee or successor located within the territorial jurisdiction of the United States or (ii) taking or continuing any act to obtain possession of, comingle, or exercise control over, such property, to the extent any such act is

NEWYORK 9364446 (2K)

inconsistent with the Restructuring Plan and Kazakhstan law relating to the restructuring of the Bank;

i.  permanently enjoins, as of the Effective Date, the commencement of any suit, action or proceeding in the territorial jurisdiction of the United States to settle any dispute which arises out of any provision of the Restructuring Plan, the Approval Decision or the Termination Order;

j.  permanently enjoins, as of the Effective Date, all entities (as that term is defined in section 101(15) of the Bankruptcy Code) subject to the Court's jurisdiction from taking any action inconsistent with the Restructuring Plan, the Approval Decision or the Termination Order, including, without limitation, against the Debtor or against its property within the territorial jurisdiction of the United States;

k.  provides that, as of the Effective Date, no action taken by the Foreign Representative in preparing, disseminating, applying for, implementing or otherwise acting in furtherance of the Restructuring Plan, any order entered in respect of this Motion, this chapter 15 case, any further order for additional relief in the chapter 15 case, or any adversary proceedings or contested matters in connection therewith, shall be deemed to constitute a waiver of the immunity afforded the Foreign Representative pursuant to section 1510 of the Bankruptcy Code;

l.  provides that this Court shall retain jurisdiction with respect to the effect, enforcement, amendment or modification of such order; and

m.  provides such other and further relief as the Court deems proper and just

(together, the "Relief Requested").

## BASES FOR RELIEF

81.   The Relief Requested is based on the provisions of chapter 15 of the Bankruptcy Code.  The purpose of chapter 15 is to "incorporate the Model Law on Cross-Border Insolvency so as to provide effective mechanisms for dealing with cases of cross-border insolvency."  11 U.S.C. § 1501(a).  Thus, "[t]he language of chapter 15 tracks the Model Law, with adaptations designed to mesh with United States law.  Congress prescribed a rule of interpretation that expressly requires United States courts to take into account the statute's international origin and to promote applications of chapter 15 that are consistent with versions of the Model Law adopted in other jurisdictions."  In re Pro-Fit Int'l Ltd., 391 B.R. 850, 857 (Bankr. C.D. Cal. 2008); see also In re British Am. Ins. Co., 425 B.R. 884, 899 (Bankr. S.D. Fla. 2010).  Accordingly, in

interpreting chapter 15, a court should "consider its international origin, and the need to promote

an application of [chapter 15] that is consistent with the application of similar statutes adopted by

foreign jurisdictions."  11 U.S.C. § 1508.[22]

**A.**     **Recognition of the Kazakhstan Proceeding as a Foreign Main Proceeding and of the Petitioner as its Foreign Representative is Appropriate**

82.     Section 1517(a) of the Bankruptcy Code provides that, after notice and a hearing,

the Court shall enter an order recognizing a foreign proceeding as a foreign main proceeding if

(i) such foreign proceeding is a foreign main proceeding within the meaning of section 1502 of

the Bankruptcy Code, (ii) the foreign representative applying for recognition is a person or body

and (iii) the petition meets the requirements of section 1515 of the Bankruptcy Code.  In re

Oversight & Control Comm'n of Avánzit, S.A., 385 B.R. 525, 532 (Bankr. S.D.N.Y. 2008).  As

explained below, the Kazakhstan Proceeding, the Petitioner and this Petition satisfy all of the

foregoing requirements.

**1.     The Kazakhstan Proceeding is a Foreign Main Proceeding**

83.     The Kazakhstan Proceeding is a foreign main proceeding and, as such, satisfies the

first condition for the entry of an order recognizing such proceeding under section 1517(a) of the

Bankruptcy Code.

84.     As an initial matter, the Kazakhstan Proceeding comes within the general definition

of "foreign proceeding" set forth in section 101(23) of the Bankruptcy Code.[23]  Section 101(23)

---

[22] The legislative history notes that "[i]nterpretation of [chapter 15] on a uniform basis will be aided by reference to the Guide [to Enactment of the UNCITRAL MODEL LAW on Cross-Border Insolvency, U.N. Gen. Ass., UNCITRAL 30th Sess. U.N. Doc. A/CN.9/442 (1997) (the "Guide")] and the Reports cited therein, which explain the reasons for the terms used and often cite their origins as well."  H. Rep. No. 109-31, pt. 1, 109th Cong., at 109 (2005).

[23] Section 101(23) of the Bankruptcy Code provides:

> The term "foreign proceeding" means a collective judicial or administrative proceeding in a foreign country, including an interim proceeding, under a law relating to insolvency or adjustment of debt in which proceeding the assets and affairs of the debtor are subject

requires that a "foreign proceeding" be (i) a collective judicial or administrative proceeding

relating to insolvency or adjustment of debt, (ii) pending in a foreign country, (iii) under the

supervision of a foreign court and (iv) for the purpose of reorganizing or liquidating the assets

and affairs of the debtor.  See 11 U.S.C. § 101(23).  The statute defines "foreign court" as "a

judicial or other authority competent to control or supervise a foreign proceeding."  See 11

U.S.C. § 1502(3).

85.   There should be little doubt that the Kazakhstan Proceeding qualifies as a "foreign

proceeding" under section 101(23).  Section 1516(a) of the Bankruptcy Code entitles this Court

to presume that a foreign proceeding is a "foreign proceeding," if the decision commencing the

foreign proceeding so indicates.  See 11 U.S.C. §§ 1516(a), 1515(b)(1).  Here, the Kazakhstan

Court in the Kazakhstan Decision acknowledged that the Kazakhstan Decision would, among

other things, form part of the basis for this Court's recognition of the Kazakhstan Proceeding

under the Model Law, Kazakhstan Decision (translation), at 13-14, and explicitly indicated that

the Kazakhstan Proceeding is "a judicial proceeding under the insolvency laws of the Republic

of Kazakhstan, which subjects the assets and activity of JSC Alliance Bank to control and

supervision by the [NBK] Committee . . ." and designated the Petitioner "as the 'foreign'

representative of JSC Alliance Bank authorized to carry out the restructuring of JSC Alliance

Bank and as the person representing JSC Alliance Bank for the purpose of any restructuring

related procedures initiated by JSC Alliance Bank outside the Republic of Kazakhstan, including

procedures for recognition of the restructuring and for appointment of the designated person to

participate in such procedures."  Kazakhstan Decision (translation), at 16.  The Kazakhstan Court

---

to control or supervision by a foreign court, for the purpose of reorganization or
liquidation.

11 U.S.C. § 101(23).

NEWYORK 9364446 (2K)

thus presupposed that the Kazakhstan Proceeding is of the kind encompassed by the section 101(23) definition of "foreign proceeding," which is based on the definition set forth in Article 2(a) of the Model Law.

86.   The Kazakhstan Proceeding is "collective" in the sense that it involves the treatment of multiple creditors and claims together rather than a resolution of a two-party dispute and requires approval by creditors representing at least two-thirds (in claim amount) of the impaired claims in order to proceed.  See Arts. 59-3(6), (7), (8) and (11) of the Banking Law and Arts. 312-4(2) and 312-5 of the Civil Procedure Code.  The Restructuring Plan is intended to directly or indirectly benefit all creditors collectively rather than to benefit any single creditor alone.

87.   The Kazakhstan Proceeding is a judicial proceeding in that the opening of the restructuring proceedings, the approval of the Restructuring Plan and the termination of the Kazakhstan Proceeding each require an order of the Kazakhstan Court, a judicial body of Kazakhstan.  See Arts. 59-3(5) and (10) of the Banking Law and Arts. 312-4 – 312-6 of the Civil Procedure Code. It is also a proceeding in which the restructuring is controlled or supervised by "the authorized agency," namely the National Bank of Kazakhstan.  See Arts. 59-3(2), (3), (4), (9), (14) and (15) of the Banking Law and Articles 312-2(2), 312-4(3) and 312-6(1) of the Civil Procedure Code.  The Kazakhstan Court's supervisory role in the Restructuring is thus shared with the National Bank of Kazakhstan through the NBK Committee.  To that extent, the National Bank of Kazakhstan is also acting as a "foreign court" within the definition of that term in section 1502(3) of the Bankruptcy Code.

88.   The Kazakhstan Proceeding is pending in a foreign country (Kazakhstan) under a law relating to insolvency, particularly Articles 59-2 and 59-3 of the Banking Law, the assets and

NEWYORK 9364446 (2K)

affairs of the Bank are subject to the control or supervision of a financial regulator (the National

Bank of Kazakhstan), and the restructuring process generally is subject to approval by a foreign

court (the Kazakhstan Court) for the purpose of reorganization, in particular, the restructuring of

the Bank's debts in return for cash payments and the issuance of securities and/or other rights.

See, e.g., Article 59-1 of the Banking Law ("Bank restructuring shall mean a package of

administrative, legal, financial, organizational and technical and other measures and procedures

to be applied to by a bank on the basis of a bank restructuring plan (the 'restructuring plan') with

the aim of improving its financial position and quality of operations."); see also Kazakhstan

Decision (translation), at 16 (regarding the Kazakhstan Proceeding "as a judicial proceeding

under the insolvency laws of the Republic of Kazakhstan" (emphasis added)).  It is also

significant that other bank restructuring proceedings under these laws, including the 2009

Kazakhstan Proceeding, have been recognized in the United States (and in other countries).  See,

e.g., In re "BTA Bank" JSC, No. 12-13081 (JMP) (Bankr. S.D.N.Y. Aug. 16, 2012) (recognition

order entered), In re JSC BTA Bank, No. 10-10638 (JMP) (Bankr. S.D.N.Y. Mar. 2, 2010)

(same); In re JSC Alliance Bank, No. 10-10761 (JMP) (Bankr. S.D.N.Y. Mar. 10, 2010) (same).

89.    In addition to qualifying as a "foreign proceeding" under section 101(23), the

Kazakhstan Proceeding qualifies as a "foreign main proceeding," which is defined in the

Bankruptcy Code as "a foreign proceeding pending in the country where the debtor has the

center of its main interests."  See 11 U.S.C. § 1502(4); see also 11 U.S.C. § 1517(b)(1)

(providing that an order of recognition as a foreign main proceeding shall be entered if the

foreign proceeding that is subject to the petition "is pending in the country where the debtor has

the center of its main interests").

NEWYORK 9364446 (2K)

90.     The relevant time period to consider in determining the location of a debtor's "center of main interests" ("COMI") is the date on which the chapter 15 petition was filed, though "a court may consider the period between the commencement of the foreign insolvency proceeding and the filing of the Chapter 15 petition to ensure that a debtor has not manipulated its COMI in bad faith." Morning Mist Holdings Ltd. v. Krys (In re Fairfield Sentry Ltd.), 714 F.3d 127, 137 (2d Cir. 2013).

91.     Although the Bankruptcy Code neither defines nor provides a conclusive test for determining the location of a debtor's COMI, it does establish a presumption that a debtor's "registered office" is its COMI. See 11 U.S.C. § 1516(c). "'Registered office' is the term used in the Model Law to refer to the place of incorporation or the equivalent for an entity that is not a natural person." H. Rep. No. 109-31 pt. 1, at 113 (2005) (citing Guide at 36).

92.     As demonstrated by its Charter (attached to the Issatayev Declaration as Exhibit B), the Bank's place of incorporation is Kazakhstan, and its registered office is located in Kazakhstan, which is thus presumed to be the center of its main interests.  This conclusion is further supported by the fact that the Bank maintains its head-office and administrative functions at its corporate headquarters in Almaty, Kazakhstan, making Almaty its principal place of business.  Moreover, most of its operations, branches, employees and customers are located in Kazakhstan, and its largest shareholder is Samruk-Kazyna, Kazakhstan's sovereign wealth fund. Indeed, the facts relevant to the location of the center of the Bank's main interests have not changed significantly since the Court recognized the 2009 Kazakhstan Proceeding as a foreign main proceeding.

93.     For all of the reasons set forth above, the Kazakhstan Proceeding is, and should be recognized as, the foreign main proceeding in respect of the Debtor.

NEWYORK 9364446 (2K)

## 2.    The Petitioner is a Foreign Representative Who is a Person

94.    The second requirement for recognition of a foreign proceeding under section

1517(a) of the Bankruptcy Code is that the foreign representative applying for recognition be a

person or body.  See 11 U.S.C. § 1517(a)(2).

95.    The term "foreign representative" is defined in section 101(24) of the Bankruptcy

Code as follows:

> [A] person or body, including a person or body appointed on an
> interim basis, authorized in a foreign proceeding to administer the
> reorganization or the liquidation of the debtor's assets or affairs or
> to act as a representative of such foreign proceeding.

11 U.S.C. § 101(24).

96.    Under section 101(41) of the Bankruptcy Code, the "term 'person' includes [an]

individual . . . ."  11 U.S.C. § 101(41).

97.    The Petitioner in this case is chairman of the Debtor's management board and the

individual whom the Kazakhstan Court has duly designated as the "'foreign' representative of

[the] Bank authorized to carry out the restructuring of [the] Bank and as a person representing

[the] Bank for the purpose of any restructuring-related procedures initiated by [the] Bank outside

the Republic of Kazakhstan, including procedures for recognition of the restructuring and for

appointment of the designated person to participate in such procedures."  Kazakhstan Decision

(translation), at 16.  As such, he is both "authorized to administer the reorganization" of the

Debtor and "to act as [its] representative," thus satisfying the second requirement for the entry of

an order recognizing the Kazakhstan Proceeding under section 1517(a) of the Bankruptcy Code.

NEWYORK 9364446 (2K)

### 3.    The Petition Meets the Requirements of Section 1515

98.    The third and final requirement for recognition of a foreign proceeding under section 1517(a) of the Bankruptcy Code is that the petition for recognition meets the procedural requirements of section 1515 of the Bankruptcy Code.  See 11 U.S.C. § 1517(a)(3).

99.    Here, all of the requirements of section 1515 of the Bankruptcy Code have been met.  First, the Debtor's chapter 15 case was duly and properly commenced by the Petitioner as foreign representative through the filing of this Petition as required by section 1515(a) of the Bankruptcy Code.

100.    Second, evidence of the existence of the Kazakhstan Proceeding and the appointment of the Petitioner as foreign representative thereof have been provided to the Court as required under section 1515(b)(1) and (d) of the Bankruptcy Code.  See Exhibit A to the Issatayev Declaration (a certified copy of the Kazakhstan Decision and a certified English translation thereof).

101.    Third, in accordance with section 1515(c) of the Bankruptcy Code, the Issatayev Declaration contains a statement identifying the Kazakhstan Proceeding as the only foreign main proceeding currently pending with respect to the Debtor and notes that, in addition, the Petitioner has obtained recognition of the Kazakhstan Proceeding as a foreign main proceeding from the UK Court under the United Kingdom's Cross-Border Insolvency Regulations 2006.[24]  See Issatayev Declaration ¶ 75.

102.    Moreover, the recognition of the Kazakhstan Proceeding by the UK Court further fortifies the conclusion that this Court should grant the Relief Requested so as to "promote

---

[24] Like chapter 15 of the Bankruptcy Code, the Cross-Border Insolvency Regulations 2006 implement the Model Law.  Compare Regulation 2 of the Cross-Border Insolvency Regulations 2006 ("The UNCITRAL Model Law shall have the force of law in Great Britain . . . .") with 11 U.S.C. § 1501(a) ("The purpose of . . . chapter [15] is to incorporate the Model Law on Cross-Border Insolvency . . . .").

applications of chapter 15 that are consistent with versions of the Model Law adopted in other

jurisdictions." In re Pro-Fit, 391 B.R. at 857; see also In re British Am. Ins. Co., 425 B.R. at

899; 11 U.S.C. § 1508 (requiring courts to "consider [chapter 15's] international origin, and the

need to promote an application of [chapter 15] that is consistent with the application of similar

statutes adopted by foreign jurisdictions.").

103.    For all of the reasons set forth above, the Petitioner respectfully submits that all of

the requirements of section 1517(a) have been satisfied and, thus, that the entry of an order

recognizing the Kazakhstan Proceeding as a foreign main proceeding is proper.

**B.    The Debtor is Entitled to the Automatic Relief Under 11 U.S.C. § 1520**

104.    Section 1520(a) of the Bankruptcy Code sets forth a series of statutory protections

that automatically result from the recognition of a foreign proceeding as a foreign main

proceeding, see 11 U.S.C. § 1520(a), including the application of the protection afforded by the

automatic stay under section 362(a) of the Bankruptcy Code to the Debtor and to the Debtor's

property that is within the territorial jurisdiction of the United States.  Given that the protections

set forth in section 1520(a) flow automatically from the recognition of a foreign main proceeding

under section 1517, the Petitioner respectfully submits that, to the extent the Court recognizes the

Kazakhstan Proceeding as a foreign main proceeding, no further showing is required.

**C.    The Discretionary Relief Requested is Necessary and Appropriate
to Effectuate the Restructuring and Should be Granted**

105.    Upon recognition of a foreign proceeding, section 1521(a) authorizes the Court to

grant "any appropriate relief" at the request of the recognized foreign representative "where

necessary to effectuate the purpose of [chapter 15] and to protect the assets of the debtor or the

interests of the creditors."  11 U.S.C. § 1521(a).  Such relief may "includ[e]" the following:[25]

---

[25] Under the Bankruptcy Code, the term "including" is not limiting.  See 11 U.S.C. § 102(3).

(1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);

(2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);

(3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a) . . . ;

(4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court; [and]

. . .

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a).

Id.  The Court may grant relief under section 1521 if the interests of "the creditors and other interested entities, including the debtor, are sufficiently protected."  11 U.S.C. § 1522(a).  In addition, "the court may, at the request of the foreign representative, entrust the distribution of all or part of the debtor's assets located in the United States to the foreign representative . . . , provided that the court is satisfied that the interests of creditors in the United States are sufficiently protected."  11 U.S.C. § 1521(b).

106.  In granting discretionary relief, the court may also act pursuant to section 1507 to provide "additional assistance" to a foreign representative under the Bankruptcy Code or other U.S. law.  11 U.S.C. § 1507(a).  The legislative history to section 1507 states that the section provides authority for "additional relief" beyond that permitted under sections 1519 to 1521.[26] In exercising discretion to grant relief under section 1507, courts will be guided by the standards set forth in subsection 1507(b), which provides that:

---

[26] H.R. Rep. No. 109-31, pt. 1, at 109 (2005).

NEWYORK 9364446 (2K)

In determining whether to provide additional assistance under this title or under other laws of the United States, the court shall consider whether such additional assistance, consistent with the principles of comity, will reasonably assure—

(1) just treatment of all holders of claims against or interests in the debtor's property;

(2) protection of claim holders in the United States against prejudice and inconvenience in the processing of claims in such foreign proceeding;

(3) prevention of preferential or fraudulent dispositions of property of the debtor;

(4) distribution of proceeds of the debtor's property substantially in accordance with the order prescribed by this title; and

(5) if appropriate, the provision of an opportunity for a fresh start for the individual that such foreign proceeding concerns.

11 U.S.C. § 1507(b).

107.  Section 1507(b) of the Bankruptcy Code substantially incorporates the provisions of former section 304(c) of the Bankruptcy Code that courts considered in deciding whether to grant relief under former section 304(b) ("former section 304").  See 11 U.S.C. § 304, repealed by Pub. L. No. 109-8, tit. VIII, § 802(d)(3), 119 Stat. 146 (2005) on April 20, 2005, repeal effective October 17, 2005.  Accordingly, courts have considered jurisprudence under former section 304 in applying section 1507 of the Bankruptcy Code.  See In re Atlas Shipping A/S, 404 B.R. 726, 738 (Bankr. S.D.N.Y. 2009).

108.  Additionally, section 105(a) of the Bankruptcy Code provides that the "court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).

109.  As noted above, the purpose of chapter 15 is to incorporate the Model Law into the United States bankruptcy law.  Chapter 15 is designed

to provide effective mechanisms for dealing with cases of cross-border insolvency with the objectives of–

NEWYORK 9364446 (2K)

(1) cooperation between—

    (A) courts of the United States, United States trustees, trustees, examiners, debtors, and debtors in possession; and

    (B) the courts and other competent authorities of foreign countries involved in cross-border insolvency cases;

(2) greater legal certainty for trade and investment;

(3) fair and efficient administration of cross-border insolvencies that protects the interests of all creditors, and other interested entities, including the debtor;

(4) protection and maximization of the value of the debtor's assets; and

(5) facilitation of the rescue of financially troubled businesses, thereby protecting investment and preserving employment.

11 U.S.C. § 1501(a). "Consistent with section 1501, the court shall cooperate to the maximum extent possible with a foreign court or a foreign representative, either directly or through the trustee." 11 U.S.C. § 1525(a); see also 11 U.S.C. § 1509(b)(3) (requiring that, once recognition of a foreign proceeding is granted, "a court in the United States shall grant comity or cooperation to the foreign representative");[27] In re Toft, 453 B.R. 186, 190 (Bankr. S.D.N.Y. 2011) (quoting section 1509).

110. For the reasons that follow, the Petitioner urges this Court to exercise its discretion under sections 105, 1507, 1509, 1521 and 1525 to grant the remaining Relief Requested, i.e., the Relief Requested beyond recognition of the Kazakhstan Proceeding as a foreign main proceeding (and of the Petitioner's position as "foreign representative" in respect thereof) and the effects of such recognition under section 1520.

---

[27] It should be noted that the term "cooperation" appears to be even broader than the term "comity." See Ad Hoc Grp. of Vitro Noteholders v. Vitro SAB de CV (In re Vitro SAB de CV), 701 F.3d 1031, 1047 (5th Cir. 2012 ), cert. denied sub nom. Vitro, S.A.B. de C.V. v. Ad Hoc Group of Vitro Noteholders, 133 S.Ct. 1862 (2013) (Mem.) ("Although use of the word 'comity' connotes recognition of another judicial proceeding, the word 'cooperation' suggests a much broader meaning.").

NEWYORK 9364446 (2K)

### 1.    Discretionary Relief Is Appropriate Under Section 1521

111.    The remaining portion of the Relief Requested, i.e., the Relief Requested that does

not flow automatically pursuant to section 1520(a) but which the Court may grant in its

discretion, is consistent with the goals of international cooperation and assistance to foreign

courts embodied in chapter 15 of the Bankruptcy Code, and is a necessary effect the

Restructuring Plan and the fair administration of the Debtor's estate.  If granted, such relief

would promote all of the legislatively enumerated objectives of section 1501(a).

112.    Fair and efficient administration of the Kazakhstan Proceeding that protects all

parties in interest requires that all Claimants be bound by the terms of the Restructuring Plan as

approved and made effective by the Kazakhstan Court and the laws of Kazakhstan.  As the Court

of Appeals for the Second Circuit has recognized, "[t]he equitable and orderly distribution of a

debtor's property requires assembling all claims against the limited assets in a single proceeding;

if all creditors could not be bound, a plan of reorganization would fail."  Victrix S.S. Co., S.A. v.

Salen Dry Cargo A.B., 825 F.2d 709, 714-15 (2d Cir. 1987); see also Cunard S.S. Co. v. Salen

Reefer Servs. AB, 773 F.2d 452, 458 (2d Cir. 1985) ("The granting of comity to a foreign

bankruptcy proceeding enables the assets of a debtor to be dispersed in an equitable, orderly and

systematic manner, rather than in a haphazard, erratic or piecemeal fashion.").  Over a hundred

years ago, the Supreme Court recognized the necessity of giving effect to foreign restructuring

plans in order to further these goals, reasoning that

> [u]nless all parties in interest, wherever they reside, can be bound
> by the arrangement which it is sought to have legalized, the
> scheme may fail.  All home creditors can be bound.  What is
> needed is to bind those who are abroad.    Under these
> circumstances the true spirit of international comity requires that
> schemes of this character, legalized at home, should be recognized
> in other countries.

Can. S. Ry. Co. v. Gebhard, 109 U.S. 527, 539 (1883).

113.  Here, it is feared that there may be Claimants who will disregard the Restructuring by seeking to obtain judgments in the United States against the Bank or its consolidated successor or act against its property located here (i.e., the Debtor's funds in the Correspondent Accounts) in relation to liabilities that were subject to the Kazakhstan Proceeding and thus obtain more than that to which they are entitled pursuant to the terms of the Restructuring Plan.  The Relief Requested is required to mitigate the risk of such creditors acting to frustrate the purposes of the Kazakhstan Proceeding, the foremost of which is the fair and efficient administration of the Debtor's assets in order to maximize value for all creditors.

114.  The other chapter 15 goals are doubly advanced by grant of the Relief Requested in this case.  It should be remembered that the Restructuring Plan is the culmination of the successful efforts of the Debtor's management, the Steering Committee, other affected creditors, equityholders and other parties in interest to restructure one of Kazakhstan's most important banks and guide it through a beneficial consolidation involving two other banks.  The Restructuring Plan was overwhelmingly approved by the Bank's Claimants and shareholders, many of whom were foreign entities who recognized that the Restructuring Plan protects their investments to the fullest extent possible under the circumstances.  The Restructuring Plan also preserves thousands of jobs at the Bank.  Moreover, banks like the Debtor are critical to providing liquidity to individuals and cash-strapped businesses.  Accordingly, rescue of the Debtor will also fortify individuals and businesses in the local and regional economies. The actions sought to be enjoined by this Petition will, if not enjoined, endanger the Restructuring of the Debtor pursuant to the Restructuring Plan to the detriment of the Debtor, its employees and customers, and the vast majority of the affected creditors who voted in favor of the Restructuring Plan or at least accepted, relied on and acted in accordance with it.

NEWYORK 9364446 (2K)

**2.    The Discretionary Relief Requested Meets the Standards for Injunctive
Relief**

115.    To the extent the standards for injunctive relief apply in this chapter 15 case to the

Relief Requested, those standards are met.  Permanent injunctive relief generally is appropriate

where the movant can show a likelihood of irreparable harm.  Irreparable harm to an estate exists

where the orderly determination of claims and the fair distribution of assets are disrupted.  See

Victrix, 825 F.2d at 713-14 ("The equitable and orderly distribution of a debtor's property

requires assembling all claims against the limited assets in a single proceeding; if all creditors

could not be bound, a plan of reorganization would fail."); see also In re Garcia Avila, 296 B.R.

95, 114 (Bankr. S.D.N.Y. 2003) ("[I]rreparable harm is present when the failure to enjoin local

actions will disrupt the orderly reconciliation of claims and the fair distribution of assets in a

single, centralized forum." (quoting Collier on Bankruptcy ¶ 304.05, at 304-21 (15th ed. rev.

2003)); In re MMG LLC, 256 B.R. 544, 555 (Bankr. S.D.N.Y. 2000) ("[I]rreparable harm exists

whenever local creditors of the foreign debtor seek to collect their claims or obtain preferred

positions to the detriment of other creditors."); In re Rubin, 160 B.R. 269, 283 (Bankr. S.D.N.Y.

1993) ("'[T]here appears to be little dispute regarding the notion that the premature piecing out

of property involved in a foreign liquidation proceeding constitutes irreparable injury,'" quoting

In re Lines, 81 B.R. 267, 270 (Bankr. S.D.N.Y. 1988))); In re Petition of Brierley, 145 B.R. 151,

168 (Bankr. S.D.N.Y. 1992) ("Harm to the estate exists from the failure to grant injunctive relief

in the form of disruption of an orderly determination of claims and the fair distribution in a

single case."  (internal quotation marks omitted)); In re Gercke, 122 B.R. 621, 626 (Bankr.

D.D.C. 1991) ("Harm to the estate also exists in the form of disruption of an orderly

determination of claims and the fair distribution in a single case," citing Victrix, 825 F.2d at

709)); <u>Lines</u>, 81 B.R. at 270 ("[T]he premature piecing out of property involved in a foreign

liquidation proceeding constitutes irreparable injury.").

116.  Several reported decisions have recognized a federal court's authority to grant

permanent injunctive relief to enforce foreign plans and discharges.  <u>See, e.g.</u>, <u>In re Rede Energia</u>

<u>S.A.</u>, 515 B.R. 69, 93 (Bankr. S.D.N.Y. 2014) (citing <u>Bd. of Dirs. Of Telecom Arg.</u>, 528 F.3d at

174-76; <u>Garcia Avila</u>, 296 B.R. at 95, and 11 U.S.C. §§ 524 & 1141, and granting permanent

injunctive relief in support of Brazilian plan); <u>In re Sino-Forest Corp.</u>, 501 B.R. 655, 666 (Bankr.

S.D.N.Y. November 25, 2013) (recognizing, enforcing and granting permanent injunctive relief

in chapter 15 case in respect of foreign plan that included protection for third-party releases in

Canadian plan); <u>In re Metcalfe & Mansfield Alt. Invs.</u>, 421 B.R. 685, 700 (Bankr. S.D.N.Y.

2010) (same); <u>In re Petition of Ho Seok Lee</u>, 348 B.R. 799, 803 (Bankr. W.D. Wash. 2006)

(granting permanent injunctive relief in a chapter 15 case as an "effective mechanism" to prevent

creditor from seeking to recover amounts in excess of what was provided under Korean plan of

reorganization); <u>In re Bd. of Dirs. of Hopewell Int'l Ins., Ltd.</u>, 238 B.R. 25, 68-69 (Bankr.

S.D.N.Y. 1999) (extending permanent injunction of Bermuda court to prohibit any creditor from

commencing or continuing actions or proceedings in the United States contrary to the Bermudan

plan in a case under former section 304); <u>Brierley</u>, 145 B.R. at 168-69 (granting permanent

injunction under former section 304 prohibiting suits against the foreign debtor, its property or

its administrators arising out of claims that could have been asserted prior to the filing of the

ancillary petition).

117.  Moreover, such injunctive relief has been granted in many chapter 15 cases without

reported decisions.  <u>See, e.g.</u>, <u>In re Zlomrex International Finance S.A.</u>, No. 13-14138 (Bankr.

S.D.N.Y. Jan. 31, 2014) (granting recognition and giving full force and effect to a UK scheme of

NEWYORK 9364446 (2K)

arrangement); <u>In re Magyar Telecom B.V.</u>, No 13-13508 (Bankr. S.D.N.Y. Dec. 11, 2013)

(granting recognition and giving full force and effect to a UK scheme of arrangement); <u>In re</u>

<u>"BTA Bank" JSC</u>, No. 12-13081 (Bankr. S.D.N.Y. Jan. 3, 2013); <u>In re Centrais Elétricas Do</u>

<u>Pará S.A.—EM Recuperação Judicial</u>, No. 12–14568 (SCC) (Bankr. S.D.N.Y. Dec. 12, 2012); <u>In</u>

<u>re JSC BTA Bank</u>, No. 10-10638, (Bankr. S.D.N.Y. Jan. 6, 2011); <u>In re Hellas Telecom.</u>

<u>(Luxembourg) V</u>, No. 10-13651 (Bankr. D. Del. Dec. 13, 2010) (granting recognition and giving

full force and effect to a UK scheme of arrangement); <u>Highlands Insurance Co. (U.K.) Limited</u>,

No. 07-13970 (MG) (Bankr. S.D.N.Y. Aug. 18, 2009); <u>In re Castle Holdco 4, Limited</u>, No. 09-

11761 (REG) (Bankr. S.D.N.Y. May 7, 2009); <u>Europaische Rueckversicherungs-Gesellschaft in</u>

<u>Zurich</u>, No. 06-13061 (REG) (Bankr. S.D.N.Y. Jan. 22, 2007); <u>In re Gordian RunOff (UK) Ltd.,</u>

<u>f/k/a GIO (UK) Ltd.</u>, No. 06-11563 (RDD) (Bankr. S.D.N.Y. Aug. 29, 2006); <u>Petition of Lloyd</u>

<u>(In re La Mutuelle du Mans Assurances IARD, U.K. Branch)</u>, No. 05-60100 (BRL), 2005 WL

3764946 (Bankr. S.D.N.Y. Dec. 7, 2005).

118.   There is also little prejudice to Claimants.  As the Supreme Court recognized,

"every person who deals with a foreign corporation impliedly subjects himself to such laws of

the foreign government, affecting the powers and obligations of the corporation with which he

voluntarily contracts, as the known and established policy of that government authorizes."

<u>Gebhard</u>, 109 U.S. at 537; <u>see also</u> <u>Cunard</u>, 773 F.2d at 458 (same) (quoting <u>Gebhard</u>, 109 U.S.

at 537).  Here, Claimants had the opportunity to informally comment on a term sheet of the

proposed Restructuring Plan that was published in August 2014.  Interests of Noteholders were

represented by the Steering Committee who contributed to the creation of the Restructuring Plan

and had the opportunity to comment and propose amendments to the Restructuring Plan prior to

its official publication in the Information Memorandum.  Claimants also had or will have the

opportunity to vote on the Restructuring Plan (either directly or through Trust Deed), to object to

the plan's approval by the Kazakhstan Court and to appeal the Approval Decision, and to object

to entry of and appeal the Termination Order.  The Requested Relief does not prevent Claimants

from exercising whatever rights they may have under Kazakhstan law.

119.  If the Restructuring as contemplated by the Restructuring Plan is not given effect in

the United States, however, there is a risk that rogue creditors could bring proceedings against

the Debtor or its property in the United States, a key financial center.  When this case is closed

and the Debtor is no longer afforded the protection of the automatic stay under section 1520(a),

these and similarly situated creditors may seek to pursue discharged claims in the United States,

dissipating the Bank's assets in litigation and possibly producing results inconsistent with the

Restructuring and in violation of the principles of equitable distribution and consensual

resolution.  Unless this Court grants the Requested Relief, irreparable harm could come to the

integrity of the Restructuring Plan and the Bank's ability to function, particularly in regard to

making and receiving payments in dollars through its Correspondent Banks in the United States.

### 3. Granting the Relief Requested Will Leave Creditors and Other Parties in Interest "Sufficiently Protected"

120.  This Petition is founded on the Congressional mandate to cooperate with foreign

proceedings and foreign representatives to promote the goals of chapter 15.  See 11 U.S.C. §

1525(a) ("Consistent with section 1501, the court shall cooperate to the maximum extent

possible with a foreign court or a foreign representative, either directly or through the trustee.").

As shown above, the Relief Requested is "appropriate" as that term is used in section 1521

because it is necessary to ensure the success of the Kazakhstan Proceeding and the Restructuring

Plan.  As noted above, however, the Court may grant such relief only if the interests of "the

creditors and other interested entities, including the debtor, are sufficiently protected." 11 U.S.C.

§ 1522(a); see also id. § 1521(b).

121.   The Bankruptcy Code does not define "sufficient protection."  The legislative

history indicates that the prohibition was meant to apply "if it is shown that the foreign

proceeding is seriously and unjustifiably injuring United States creditors."  H. Rep. No. 109-31,

pt. 1, at 116 (2005).  A determination of sufficient protection "requires a balancing of the

respective parties' interests."  In re AJW Offshore, Ltd., 488 B.R. 551, 559 (Bankr. E.D.N.Y.

2013) (citing SNP Boat Serv. S.A. v. Hotel Le St. James, 483 B.R. 776, 784 (Bankr. S.D. Fla.

2012); CT Inv. Mgmt. Co. v. Cozumel Caribe, S.A. de C.V. (In re Cozumel Caribe), 482 B.R.

96, 108 (Bankr. S.D.N.Y. 2012)); see also In re Qimonda AG Bankr. Litig., 433 B.R. 547, 556-

58 (E.D. Va. 2010); Rede, 515 B.R. at 94 ("Section 1522 requires the bankruptcy court to ensure

the protection of both the creditor(s) and the debtor(s)."); Toft, 453 B.R. at 196 n.11 (referring to

balancing of interests); In re Tri-Cont'l Exch. Ltd., 349 B.R. 627, 637 (Bankr. E.D. Cal. 2006);

Guide ¶ 161 ("The idea underlying article 22 is that there should be a balance between relief that

may be granted to the foreign representative and the interests of the persons that may be affected

by such relief.  This balance is essential to achieve the objectives of cross-border insolvency

legislation."); see also In re Sivec SRL, 476 B.R. 310, 323 (Bankr. E.D. Okla. 2012) (citing

Guide); In re Lee, 472 B.R. 156, 180-81 (Bankr. D. Mass. 2012) (same); In re Int'l Banking

Corp., 439 B.R. 614, 626 (Bankr. S.D.N.Y. 2010) (same).  Section 1522 "gives the bankruptcy

court broad latitude to mold relief to meet specific circumstances."  Int'l Banking, 439 B.R. at

626 (internal quotations omitted); Atlas Shipping, 404 B.R. at 740; see also In re Artimm, 278

B.R. 832, 837 (Bankr. C.D. Cal. 2002) (Section 304 "discretion typically points in favor of

granting relief to § 304 petitioners," and "section 304 gives a court wide latitude to mold

appropriate relief so that a foreign insolvency can proceed in a rational fashion with due regard for all of the varied and competing interests at issue.").

122. In the <u>Metcalfe</u> case, the foreign representative sought relief under section 1507, so the court employed the traditional principles of comity as they applied under former section 304, which was repealed and replaced by chapter 15 in 2005.[28] More recently, however, the Court of Appeals for the Fifth Circuit, while acknowledging that "[t]he relationship between [section] 1507 and [section] 1521 is not entirely clear," held that assuming "[section] 1521(a)(1)-(7) and (b) does not list the requested relief, a court should decide whether it can be considered 'appropriate relief' under [section] 1521(a)." <u>Vitro</u>, 701 F.3d at 1054, 1056 (internal quotation marks omitted). "This, in turn, requires consideration of whether such relief has previously been provided under § 304. This latter consideration aligns with Congress's intent that § 1521 was not intended to 'expand or reduce the scope of relief' previously available under other provisions, including § 304. H.R.Rep. No. 109–31, pt. 1, at 116. A court should also consider whether the requested relief would otherwise be available in the United States." <u>Id.</u> at 1056-57 (internal case citations omitted). (Under Fifth Circuit law, section 1507 "additional assistance" is reserved for requests for relief that are not enumerated in section 1521(a), available under former section 304 or "otherwise available in the United States." <u>Id.</u> at 1057.)

123. As noted above, relief similar to the Requested Relief was granted in ancillary cases under former section 304 (and in actions on debt discharged abroad almost a century before

---

[28] The former section 304 "comity factors" are now found in section 1507 of the Bankruptcy Code, which provides, <u>inter alia</u>, that this Court may provide "additional assistance" to a recognized foreign representative "consistent with principles of comity." Nevertheless, it is not clear that such factors should apply to requests for "appropriate relief" under section 1521(a). The legislative history to section 1507 states that "[t]his section is intended to permit the further development of international cooperation begun under section 304, but is not to be the basis for denying or limiting relief otherwise available under [chapter 15]." H. Rep. No. 109-31, pt. 1, at 109 (2005). On the other hand, the legislative history to section 1521, which allows the Court to grant "any appropriate relief," states that "[t]his section does not expand or reduce the scope of relief currently available in ancillary cases under sections 105 and 304 . . . ." <u>Id.</u> at 116.

NEWYORK 9364446 (2K)

former section 304 was enacted).  Gebhard, 109 U.S. at 539 (concluding that actions brought in

the United States by plaintiff bondholders who did not participate in the Canadian insolvency

proceedings of the bond issuer could not be maintained, even though the bonds were payable in

New York); Argo Fund Ltd. v. Bd of Dirs of Telecom Arg., S.A. (In re Bd. of Dirs. of Telecom

Arg., S.A.), 528 F.3d 162, 173 (2d Cir. 2008) (concluding that the bankruptcy court did not

abuse its discretion in granting full force and effect to Argentine plan and approval order in the

United States); Hopewell, 238 B.R. at 68-69 (extending injunction of Bermuda court to prohibit

any creditor from commencing or continuing actions or proceedings in the United States contrary

to the Bermudan plan in a case under former section 304); Brierley, 145 B.R. at 168-69 (granting

permanent injunction under former section 304 prohibiting suits against the foreign debtor, its

property or its administrators arising out of claims which could have been asserted prior to the

filing of the ancillary petition).  Furthermore, binding plans and discharge injunctions are

routinely available to chapter 11 debtors under sections 524 and 1141 and would thus be

"otherwise be available in the United States."  Indeed, such concepts are the familiar basis of a

reorganized debtor's "fresh start" under the Bankruptcy Code.  Accordingly, under the Vitro

court's framework, the Relief Requested would be analyzed under section 1521 rather than

section 1507.[29]

124.  Wherever the divide between section 1507 and sections 1521-22 lies, the Relief

Requested in the Motion meets both the comity and "sufficient protection" standards.[30]  The

---

[29] In addition, section 1509(b), which grants a recognized foreign representative standing to seek "appropriate relief," states that "a court in the United States shall grant comity or cooperation to the foreign representative," and the Vitro court stated that "cooperation" is more expansive than "comity."  Vitro, 701 F.3d at 1047 ("Although use of the word 'comity' connotes recognition of another judicial proceeding, the word "cooperation" suggests a much broader meaning.").

[30]  For the avoidance of doubt, the Foreign Representative requests "additional assistance" in the form of the Requested Relief under section 1507 to the extent the Court believes it necessary to invoke that section to grant such relief.

principles of comity which courts have applied in cases where a foreign representative has

sought injunctive relief in support of a foreign plan are drawn from the jurisprudence granting

comity to ordinary judgments.  Such principles focus on procedural fairness.  In Metcalfe, for

example, the court stated that its task was to determine whether the procedures used in the

foreign insolvency proceeding accorded with American views of fundamental fairness.[31]  421

B.R. at 697; see also Telecom Arg., 528 F.3d at 173 (stating that comity "does not require that

foreign proceedings afford a creditor identical protections as under U.S. bankruptcy law" and

holding that the absence of a "best interests" test does not prevent recognizing of ancillary

foreign proceedings under former section 304); Rede, 515 B.R. at 92 ("Foreign judgments 'are

generally granted comity as long as the proceedings in the foreign court "are according to the

course of a civilized jurisprudence, i.e. fair and impartial."'" (citing Toft, 453 B.R. at 194 (citing

Ephedra Prods. Liab. Litig., 349 B.R. at 336 (citing and quoting the seminal case on comity,

Hilton v. Guyot, 159 U.S. 113, 205-06, 16 S.Ct. 139, 40 L.Ed. 95 (1895))))); Hopewell, 238 B.R.

at 56-61 (barring objections not raised before the foreign insolvency court and stating, "[a]s long

as the manner in which the scheme acquired statutory effect comports with our notions of

procedural fairness, comity should be extended to it."); Universal Cas. & Sur. Co. v. Gee (In re

Gee), 53 B.R. 891, 902, 904 (Bankr. S.D.N.Y. 1985) (stating that "[f]or comity to be extended, it

---

[31] A court might focus on the substance of a foreign plan to the extent it is alleged that granting relief in support of it would be manifestly contrary to the public policy of the United States.  See 11 U.S.C. § 1506; see also Telecom Argentina, 528 F.3d at 171-72 ("Comity is generally appropriate where the foreign 'proceedings do not violate the laws or public policy of the United States and if the foreign court abides by fundamental standards of procedural fairness.'" citing Finanz AG Zurich v. Banco Economico S.A., 192 F.3d 240, 246 (2d Cir.1999)).  The legislative history indicates that the "public policy" exception is narrow, applying only to the "most fundamental policies of the United States."  H. Rep. No. 109-31, pt. 1, at 109 (2005).  One court has determined, for example, that the lack of an opportunity for a jury trial is not manifestly contrary to U.S. public policy.  See In re Ephedra Prod. Liab. Litig., 349 B.R. 333 (Bankr. S.D.N.Y. 2006) (concluding that the public policy exception embodied in section 1506 should be "narrowly interpreted, as the word 'manifestly' in international usage restricts the public policy exception to the most fundamental policies of the United States") (citing H. R. Rep. No. 109-31(I), at 109, reprinted in 2005 U.S.C.C.A.N. 88, 172) (grammatical changes omitted).  The Petitioner submits that none of the Relief Requested or any part of the Kazakhstan Proceeding violates fundamental procedural fairness or is manifestly contrary United States public policy.

NEWYORK 9364446 (2K)

is necessary only that the foreign court abide by fundamental standards of procedural fairness"
and noting that the ancillary court, if satisfied with the procedural fairness of the foreign
proceeding, "should not sit as an appellate court over the foreign proceedings").  The <u>Metcalfe</u>
court examined the plan using the traditional standards used by American courts to analyze
whether ordinary foreign judgments should be recognized and enforced, <u>viz</u>, whether the forum
provides "a full and fair trial abroad before a court of competent jurisdiction, conducting the trial
upon regular proceedings, after due citation or voluntary appearance of the defendant, and under
a system of jurisprudence likely to secure an impartial administration of justice between the
citizens of its own country and those of other countries, and there is nothing to show either
prejudice in the court, or in the system of laws under which it is sitting." <u>Metcalfe</u>, 421 B.R. at
698 (internal citations omitted).

125.  In this case, the Restructuring readily meets these standards.  First, the Kazakhstan
Court's exercise of jurisdiction over the Bank and its restructuring was proper not only under
Kazakhstan law but also under international standards.  As set forth above, the Kazakhstan is the
country in which the Bank has the center of its main interests.  The factors employed for that
determination are similar to United States and international norms for establishing the propriety
of an exercise of jurisdiction to adjudicate.  <u>See</u> Am. Law Inst., <u>Restatement of the Law of the
Law of Foreign Relations (3d)</u>, § 421 (1987) (setting forth "reasonableness" standard for exercise
of jurisdiction to adjudicate and citing presence, law of organization, regular conduct of business,
and consent to jurisdiction as indicators of reasonable exercise of such jurisdiction by a particular
country over a company).  Those norms are unquestionably met here.

126.  Interested parties were afforded adequate opportunity to be heard.  The Bank
notified its depositors, creditors, correspondent banks and other relevant parties of the

commencement of Kazakhstan Proceeding by publishing notice in the <u>Yegemen Kazakhstan</u> and

<u>Kazakhstanskaya Pravda</u> newspapers and posting notice on the Bank's website. In addition,

notice by mail was given to the Correspondent Banks.

127. On October 13, 2014, the Bank published the Information Memorandum, which

contained the Restructuring Plan, comprehensive information about the Bank, its situation, the

consolidation and the effects of the Restructuring Plan, notice of the Claimants' Meeting, the

Noteholders' Meetings and the General Shareholders' Meeting and instructions as to how to vote

and object. The Information Memorandum is similar in form and purpose to a disclosure

statement in chapter 11 proceedings. The Information Memorandum was made available to

interested parties (with certain limited exceptions dictated by non-Kazakhstan (including U.S.)

securities laws) on the Bank's website. As noted above, further notice of the Claimants' Meeting

was published in in the <u>Financial Times</u> (in English) on October 14, 2014, <u>The Wall Street</u>

<u>Journal</u> (in English) on October 15, 2014, <u>Kazakhstanskaya Pravda</u> (in Russian) on October 18,

2014, and <u>Yegemen Kazakhstan</u> (in Kazakh) on October 18, 2014. Notice of such meeting was

also sent to the Kazakhstan Stock Exchange on October 17, 2014. The owners of the Notes were

also notified of the Noteholders' Meetings through notices distributed through Euroclear and

Clearstream. The notices of the Noteholders' Meetings included a reference to the Information

Memorandum which, in turn, included notice of the Claimants' Meeting. Similarly, notices of

the General Shareholders' Meeting were published on the website of the Kazakhstan Stock

Exchange and the corporate websites of the Bank, Temirbank and Fortebank on October 10,

2014. The Bank of New York Mellon, in its capacity as the GDR depository, also sent a proxy

form to shareholders holding GDRs and initiated a corporate event in the clearing systems with

respect to the shareholders' meeting.

NEWYORK 9364446 (2K)

128.  All of the Claimants participating at the Claimants' Meeting had the opportunity to ask questions and make objections in respect of the Restructuring Plan, which was accepted by more than two-thirds by value of voting Claimants.  Similarly, the necessary shareholder resolution passed overwhelmingly at the General Shareholders' Meeting.

129.  Notice of a hearing before the Kazakhstan Court to seek approval of the Restructuring Plan will be published by a press release on the Bank's website and the website of the Kazakhstan Stock Exchange.  In addition, the Bank will email the press release to the email addresses of the Trustee (with the request that it be sent through the clearing systems to Noteholders) and to Samruk-Kazyna.  All Claimants are allowed to submit written objections and evidence to be considered at the hearing and to appeal the Approval Decision.

130.  The procedures followed regarding notice, information, voting, and opportunity to object and present evidence in the Kazakhstan Proceeding are similar to those employed in chapter 11 cases in the United States.  Accordingly, the Foreign Representative submits that they met the standards required to "sufficiently protect" creditors and other parties in interest.

131.  The Claimants are also sufficiently protected in respect of the treatment afforded them in the Restructuring.  Such treatment need not be identical to that which might have been obtained in the United States.  It is sufficient if the result is "comparable" or "similar."  Vitro, 701 F.3d at 1044 (citing cases); Sino-Forest, 501 B.R. at 665 (quoting Metcalfe); Metcalfe, 421 B.R. at 697.  Furthermore, the mere fact that a foreign representative requests relief that would be available under the law of the foreign proceeding, but not in the United States, is not grounds for denying comity. See In re Condor Ltd., 601 F.3d 319, 327 (5th Cir. 2010).

132.  The distribution of consideration under the Restructuring Plan is substantially in accordance with what might occur under U.S. law.  Similarly situated Claimants are each treated

similarly to other such Claimants.  Further, United States and other non-Kazakhstan Claimants

had and have essentially the same rights to participate in the Kazakhstan Proceeding as

Kazakhstan Claimants, with some adjustments made as a result of non-Kazakhstan securities

laws.  Moreover, the Restructuring Plan respects and reflects the contractual subordination rights

of the Par Notes and Discount Notes vis-à-vis the Subordinated Tenge B Notes, as would be

expected to occur under U.S. law.

133.  As described above, eligibility for Entitlements under the Restructuring Plan is

obtained only upon execution and delivery of the Deed of Release.  Thus, holders of each series

of Notes must collectively elect to exchange the releases of non-Debtor third parties as set forth

in the Deed of Release[32] for their respective Entitlements.[33]  The holders of the Dollar Discount

Notes, Tenge Discount Notes, Dollar Par Notes and Recovery Notes overwhelmingly elected to

direct their respective Trustees to execute the Deed of Release on behalf of the full nominal

amount of such series of Notes and to receive their respective Entitlements.  To date, holders of

the Subordinated Tenge B Notes and the Dollar Tenge Notes have not elected to direct their

respective Trustees to deliver the Deed of Release and therefore retain any rights of action they

may have against the non-Debtor Released Parties.  Such Noteholders will not receive

Entitlements unless and until they so direct their respective Trustee.

134.  The election by a series of Noteholders to direct their Trustee to enter into a Deed

of Release is made via Extraordinary Resolution.  The process for authorizing Extraordinary

Resolutions is set forth in the Trust Deed, which is governed by English law and permits a

---

[32] The non-debtor releases contained in the Deed of Release contain appropriate carveouts for liabilities based on willful misconduct, gross negligence and fraud.

[33] The Deed of Release also releases the Debtor, but, as described above, the Debtor will receive a discharge of all Designated Financial Indebtedness by operation of Kazakhstan law and the Restructuring Plan, regardless of whether a Deed of Release is executed.

NEWYORK 9364446 (2K)

supermajority of 75% of the respective Notes present at a Noteholders' Meeting with proper

quorum to bind all holders of such Notes to the measures set forth in the resolution.

Accordingly, the non-Debtor releases do not result from Kazakhstan law or the Restructuring

Plan but rather from the contractual terms governing the existing Notes.

135.   Finally, the exchange of the releases of non-debtors for distributions under a plan is

not inappropriate.  Indeed, chapter 11 plans containing third-party releases that are consensual

are often granted in the United States.  See e.g., Deutsche Bank AG v. Metromedia Fiber

Network, Inc. (In re Metromedia Fiber Network, Inc.), 416 F.3d 136, 142 (2d Cir. 2005) (noting

that "[n]ondebtor releases may also be tolerated if the affected creditors consent"); In re Oneida

Ltd., 351 B.R. 79, 94 (Bankr. S.D.N.Y. 2006) (finding third-party releases which provided

creditors with the opportunity to opt-out fall directly into the category of consensual releases that

the Metromedia court noted were appropriate); In re Exide Techs., 303 B.R. 48, 74 (Bankr. D.

Del. 2003) ("The 'Releases by Holders of Claims' provision . . . binds only those creditors and

equity holders who accept the terms of the Plan.  Because it is consensual, there is no need to

consider [additional] factors.").[34]

136.   Nor does it matter that the right to a distribution depends upon consenting to such

releases.  In In re Washington Mutual, Inc. the court found no discrimination within a class of

creditors where an option existed for each member to settle claims (or not) against non-debtor

third parties in exchange for a distribution.  442 B.R. 314, 355-56 (Bankr. D. Del. 2011).  Here,

each holder of Notes of the same series has an identical right to vote at a Noteholders' meeting

---

[34] See also In re Saint Vincents Catholic Medical Centers of N.Y., No. 10-11963 (CGM), Docket No. 3060 at 19 (Bankr. S.D.N.Y. June 29, 2012) (finding that third-party releases, which allowed parties to opt-out, were consensual); In re Houghton Mifflin Harcourt Publishing Co., Case No. 12-12171 (REG), Docket No. 122 (Bankr. S.D.N.Y. Jun. 21, 2012) (same); In re General Maritime Corp., No. 11-15285 (MG), Docket No. 794 at 22 (Bankr. S.D.N.Y. May 7, 2012) (same); In re Tricom, S.A., No. 08-10720 (SMB), Docket No. 568 at 7 (Bankr. S.D.N.Y. Oct. 21, 2009) (same).

on one of two options:  (i) for Noteholders in the series to retain their rights against non-debtors

and forego their respective Entitlements or (ii) for such Noteholders to authorize their Trustee to

enter into the Deed of Release and receive their Entitlements.  Moreover, each holder of Notes of

the same series will receive equal treatment, as determined in accordance with the supermajority

voting threshold contained in the Trust Deed.  Accordingly, the exchange of non-debtor releases

for distributions under the Plan is appropriate, similar to relief available under U.S. law, and does

not impair the significant procedural or substantive protections granted to Claimants in the

Kazakhstan Proceeding.

137.  For the foregoing reasons, the Requested Relief can and should be granted.

## NOTICE

138.  Notice of this Petition will be provided to (i) the Office of the United States Trustee

for the Southern District of New York, (ii) the Debtor, (iii) the Trustee (with the request that it be

sent to Noteholders through the clearing systems using their ordinary procedures), (iv) the

Steering Committee, (v) the Correspondent Banks, and (vi) all parties required to be given notice

under Bankruptcy Rule 2002(q)(1) of which the Petitioner is aware.  Notice of this Petition by

publication in the National Edition of The Wall Street Journal and through a press release which

will be posted on the Debtor's website and widely disseminated through international wire

services will also be made.  The Petitioner submits that no other or further notice need be

provided.

## NO PRIOR REQUEST

139.  No previous request for the Relief Requested has been made to this or any other

court.

WHEREFORE, for the reasons set forth herein, the Petitioner respectfully requests that this Court enter an order granting (i) the Relief Requested and (ii) the Petitioner and Debtor such other and further relief as the Court deems proper and just.

Dated:   New York, New York
         November 20, 2014

WHITE & CASE LLP

_/s/ Scott Greissman_
Scott Greissman
Richard A. Graham
Thomas E. MacWright
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone:  (212) 819-8200
Facsimile:  (212) 354-8113

Attorneys for Timur Rizabekovich Issatayev
as Petitioner and Foreign Representative

## <u>VERIFICATION</u>

TIMUR RIZABEKOVICH ISSATAYEV hereby declares:

1.      I am the Chairman of the Management Board of JSC Alliance Bank and have been

authorized by the Specialized Financial Court of Almaty City to commence and act in this

ancillary case.

2.      I have read this Verification and the foregoing Petition and I am informed and

believe that the factual allegations contained therein are true and correct.

3.      I verify under penalty of perjury under the laws of the United States of America that

the foregoing is true and correct.

Executed:  Almaty, Republic of Kazakhstan
                November  20, 2014

_____
*/s/Timur Rizabekovich Issatayev*
TIMUR RIZABEKOVICH ISSATAYEV
