WHITE & CASE LLP
1155 Avenue of the Americas
New York, New York 10036-2787
Telephone: (212) 819-8200
Facsimile: (212) 354-8113
Scott Greissman
Richard A. Graham
Thomas E. MacWright

*Attorneys for Timur Rizabekovich Issatayev*
*as Petitioner and Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| In re | ) | Chapter 15 |
| | ) | |
| JSC Alliance Bank, | ) | Case No. 14-13194 (SHL) |
| | ) | |
| Debtor in a Foreign Proceeding. | ) | |
| | ) | |

**DECLARATION OF TIMUR RIZABEKOVICH ISSATAYEV**
**PURSUANT TO 28 U.S.C. § 1746**

I, Timur Rizabekovich Issatayev, Ushkonyr St. 10, Kuramys Village, Almaty

City, Republic of Kazakhstan, declare under penalty of perjury under the laws of the United

States of America that the following is true and correct:

1.    I submit this declaration (the "Declaration") in support of the Verified Petition for

Recognition of Foreign Main Proceeding dated November 20, 2014 (together with the Form of

Voluntary Petition filed contemporaneously therewith, the "Petition"),[1] which seeks entry of an

order (i) pursuant to section 1517 of the Bankruptcy Code[2] recognizing (a) the voluntary

restructuring proceeding under Kazakhstan law (the "Kazakhstan Proceeding") concerning JSC

Alliance Bank (the "Bank" or "Debtor") as the "foreign main proceeding" (as defined in section

---

[1] Except as otherwise indicated, capitalized terms used herein carry the meanings ascribed to them in the Petition.
[2] Except as otherwise indicated, section and chapter references are to the Bankruptcy Code.

1502 of the Bankruptcy Code) in respect of the Bank and (b) me as the "foreign representative" (as defined in section 101(24) of the Bankruptcy Code) in respect of the Kazakhstan Proceeding, (ii) granting all the relief afforded to foreign main proceedings pursuant to section 1520 of the Bankruptcy Code, and (iii) granting further permanent relief pursuant to sections 105(a), 1507(a), 1509(b)(2)-(3), 1521 and 1525(a) of the Bankruptcy Code in support of the financial restructuring of the Debtor through a plan of reorganization in the Kazakhstan Proceeding, if such plan is sanctioned by the Kazakhstan Court and the National Bank of Kazakhstan, all in accordance with applicable Kazakhstan law.

2.    I make this Declaration on the basis of documentation in my possession or supplied to me and on facts and matters that are known to me or of which I have been informed by others.  Where I have been informed by others, the information is true to the best of my knowledge and belief.

3.    I am the chairman of the Bank's management board, and the Kazakhstan Court appointed me foreign representative pursuant to pursuant to a decision (the "Kazakhstan Decision") of the Specialized Financial Court of Almaty City (together with its legal successor,[3] the "Kazakhstan Court") made on March 3, 2014.  A true and correct, certified copy of the Kazakhstan Decision and a certified English translation thereof are attached hereto as Exhibit A. Through my role as chairman, I am fully aware of, and closely involved in, all of the financial affairs and overall restructuring of the Bank.  The Kazakhstan Decision authorized me both "to carry out the restructuring of JSC Alliance Bank" and designated me "as a person representing JSC Alliance Bank for the purpose of any restructuring related procedures initiated by JSC

---

[3] Pursuant to the Decree of the President of the Republic of Kazakhstan dated April 4, 2014, the Specialized Financial Court of Almaty was abolished and its powers were transferred to the Specialized Inter-district Economic Court of Almaty.  Accordingly, although the Kazakhstan Proceeding (as defined below) was initiated in the Specialized Financial Court of Almaty, it is now pending there.

Alliance Bank outside the Republic of Kazakhstan, including procedures for recognition of the restructuring and for appointment of the designated person to participate in such procedures." Kazakhstan Decision, at 16 (translation).

## A.    The Debtor

4.    The Bank was organized and incorporated under the laws of Kazakhstan in 1993 as an open joint stock company under the name IrtyshBusinessBank OJSC.  A true and correct copy of the Bank's current charter (the "Charter") and a certified English translation thereof is attached hereto as Exhibit B.  Since 1993, it has operated as a bank, accepting deposits and making loans.  In 1999, IrtyshBusinessBank OJSC merged with Semipalatinsk City Bank, another regional bank which was based in Eastern Kazakhstan.  The combined bank primarily served large industrial enterprises in the Eastern Kazakhstan and Pavlodar regions.

5.    In October 2001, a consortium of Kazakhstan companies, led by Seimar Alliance Financial Corporation, acquired 64% of the issued shares in the Bank.  Following the completion of this transaction, the Bank changed its name to JSC Alliance Bank.

6.    On December 26, 2007, the Agency of the Republic of Kazakhstan for the Regulation and Supervision of Financial Markets and Financial Organizations ("FMSA") issued the Bank its current banking license (No. 250).  The Bank's registration number with the Ministry of Justice of Kazakhstan is 4241-1900-AO, dated March 13, 2004.  The principal place of the Bank's business, in the sense of decision-making and other head office functions, is its registered office located at 50 Furmanov Street, Almaty 050004, Republic of Kazakhstan.

## B.    The Business of the Debtor

7.    The Bank is the ninth largest in terms of total assets in Kazakhstan, operating as a universal financial institution in all business segments but focusing primarily on the retail

market and lending to small and medium-sized enterprises. As of June 30, 2014, it had a network of 19 branches and 101 cash offices located throughout Kazakhstan.

8.     The overwhelming majority of the Bank's operations and assets (nearly 100% by value as of June 1, 2014) are located in Kazakhstan. As of June 30, 2014, the Bank had 3,302 employees within Kazakhstan. Most of the Bank's directors and executive officers reside in Kazakhstan. The Bank wholly owns two currently inactive subsidiaries: Alliance Finance LLC (in the Russian Federation) and OUSA Alliance LLC (in Kazakhstan).

## C.     Events Leading to Commencement of the Kazakhstan Proceeding

### 1.  Previous Financial Difficulties and Past Restructuring

9.     From 2004 to 2007, the Bank expanded rapidly, primarily funded by short term bank borrowings and debt securities issued in the international capital markets. The Bank experienced severe liquidity difficulties as a result of the world-wide financial crisis which began in the middle of 2007. The Bank also faced a serious deterioration in the quality of its loan portfolio as Kazakhstan's economic growth slowed. Further, the Bank suffered a loss of substantial assets through the fraud of its former management.

10.    By March-April 2009, the Bank was unable to meet its obligations to creditors. At this time, having defaulted under a US$ 150 million financing agreement, the Bank suspended the repayment of all outstanding principal amounts under other agreements. The Bank also breached the capital adequacy and liquidity requirements of its then-principal regulator, the FMSA.

11.    Consequently, the Bank was instructed by the FMSA to initiate negotiations with its creditors and agreed to enter into an agreement with the FMSA in April 2009 (as amended, the "FMSA Agreement") concerning the restructuring of the Bank (the "2009 Restructuring"). The FMSA Agreement imposed certain restrictions on the Bank, and the Bank agreed to

develop and present to the FMSA an indicative restructuring and recapitalization plan by July 15, 2009.

12.    On July 14, 2009, the Bank submitted such indicative restructuring plan to the FMSA in accordance with the FMSA Agreement, and such plan was approved by the FMSA on July 21, 2009.

13.    The Kazakhstan Court granted the Bank's application for restructuring in September 2009, commencing the Bank's first insolvency proceeding (the "2009 Kazakhstan Proceeding"), which resulted in an automatic stay of all relevant claims of the Bank's creditors and protection of the Bank's property from execution and attachment until completion of the 2009 Restructuring.  In December 2009, the Bank's financial creditors approved the definitive restructuring plan (the "2009 Restructuring Plan"), and shortly thereafter, the Sovereign Wealth Fund of the Republic of Kazakhstan ("Samruk-Kazyna") acquired 100% of the Bank's common and preference shares.

14.    On February 26, 2010, the Kazakhstan Court issued an order granting final approval to the 2009 Restructuring Plan.

15.    On March 10, 2010, this Court recognized the 2009 Kazakhstan Proceeding.[4]  In re JSC Alliance Bank, No. 10-10761 (JMP) (Bankr. S.D.N.Y. Mar. 10, 2010).  A copy of the recognition order is attached hereto as Exhibit C.

16.    As part of the 2009 Restructuring, the Bank issued securities on March 25, 2010 in an aggregate principal amount of US$ 835,459,252 and KZT 23,522,743,230[5] and entered into a

---

[4] On December 18, 2009, Mr. A. Elleray QC (sitting as a Deputy Judge of the Chancery Division of the High Court of Justice of England and Wales (the "UK Court")) made an order (the "2009 UK Recognition Order") which recognized the 2009 Kazakhstan Proceeding as a foreign main proceeding in accordance with the UNCITRAL Model Law on Cross-Border Insolvency (the "Model Law") as set out in Schedule 1 to the UK Cross-Border Insolvency Regulations 2006.

[5] As of November 20, 2014, one U.S. dollar (US$) was equal to approximately 181 Kazakhstani tenge (KZT).

trust deed (the "Trust Deed")[6] with BNY Mellon Corporate Trustee Services Ltd (formerly BNY Corporate Trustee Services Ltd) as trustee (the "Trustee") constituting these securities.  Under clause 2.1 thereof, the Bank issued the following securities:

> a.   US$ 615,138,114 in principal amount of discount US dollar notes ("Discount Dollar Notes");
>
> b.   KZT 966,814,140 in principal amount of discount tenge notes ("Discount Tenge Notes" together with the Discount Dollar Notes, the "Discount Notes");
>
> c.   US$ 219,343,079 in principal amount of notes repayable at par in dollars ("Par Dollar Notes");
>
> d.   KZT 1,248,534,571 in principal amount of notes repayable at par in tenge ("Par Tenge Notes" together with the Par Dollar Notes, the "Par Notes");
>
> e.   KZT 21,307,394,519 in principal amount of subordinated class B notes denominated in tenge ("Subordinated Tenge B Notes"); and
>
> f.   US$ 978,059 in principal amount of notes entitling their holders to certain distributions out of recoveries or realizations in relation to certain assets, primarily impaired loans and tax credits ("Recovery Notes" and, together with the above other securities, the "Notes" and the holders of the Notes, the "Noteholders").

17.   Pursuant to the Trust Deed, the Bank is obliged to make payments under the Notes on March 25th and September 25th each year until their respective maturity dates.  Additional payments are also due on the Recovery Notes on June 25th and December 25th each year until maturity.

18.   On March 30, 2010, Samruk-Kazyna converted KZT 105 billion (US$ 715 million) of the debt the Bank owed it into convertible preference shares in the Bank and recapitalized the Bank by subscribing for additional common shares for KZT 24 billion (US$ 163 million).[7]

---

[6] A copy of the Trust Deed is attached hereto as Exhibit D.
[7] As of June 30, 2014, Samruk-Kazyna held approximately 51% of the Bank's common shares and KZT 67,100 million of deposits with the Bank.

19.    In connection with this restructuring, Samruk-Kazyna, as the Bank's majority shareholder, executed a deed poll wherein it undertook, inter alia, to procure that certain matters could not be approved unless higher thresholds than usually applicable under Kazakhstan law were reached at the relevant general shareholders' meeting or board meeting and that certain matters, which ordinarily could be approved by the Bank's board, would instead require shareholder approval (the "SK Undertaking").

**2.    Renewed Financial Difficulties**

20.    During 2012 and 2013, the financial condition of the Bank deteriorated once more, primarily as a result of a material increase in its non-performing loans (currently, more than 50% of the Bank's loan portfolio is non-performing) and significant outflows of customer deposits (particularly since mid-2013 and continuing in 2014).  In 2013, the Bank's ratings were downgraded by Fitch and S&P to "C" and "CCC" respectively, which further impaired the Bank's ability to raise funds and increased its cost of financing.  As of December 31, 2013, as shown in its audited International Financial Reporting Standards ("IFRS") financial statements, the Bank had negative equity of some KZT 75 billion, reflecting additional provisions made in respect of bad loans, de-recognition of some deferred tax assets, deteriorating operating performance and negative earnings.

21.    Faced with its challenging financial condition, in the last quarter of 2013 the Bank's management determined to cease making payments into the collection account that funds payments on the Recovery Notes and, on December 13, 2013, held a meeting in London with investors to discuss the Bank's financial situation.

22.    The Bank was confronting several challenges to its financial position.  First, its capital reserves had deteriorated to such an extent that it risked breaching the minimum regulatory capital adequacy requirements to which it is subject.  Second, due to its decline in

profitability, the Bank had insufficient retained earnings to restore its capital position or to meet its obligations to creditors, including the Noteholders and Samruk-Kazyna. Finally, the Bank anticipated that it would shortly have to suspend making scheduled payments to other creditors (in addition to holders of the Recovery Notes) in order to preserve its limited liquidity.

23.     On December 26, 2013, as a result of the withholding of payments into the collection account, the Bank failed to make a payment on the Recovery Notes.

24.     On January 30, 2014, the board of directors of the Bank decided to initiate restructuring proceedings in Kazakhstan and instructed the Bank's management board to take the steps necessary to do so. On February 3, 2014, the National Bank of Kazakhstan (the central bank and current primary financial regulator in Kazakhstan) approved the initiation of the restructuring of the Bank's balance sheet and, on February 6, 2014, the Bank and the Committee for Control and Supervision of the Financial Markets and Financial Organizations of the National Bank of Kazakhstan (the "NBK Committee") executed an agreement to prescribe the negotiation of a restructuring plan.

25.     The Bank engaged White & Case Kazakhstan LLP as its legal advisers and appointed Lazard Frères as its financial advisers in connection with its restructuring.

**D.      Commencement of the Kazakhstan Proceeding**

26.     On February 25, 2014 the Bank applied for restructuring (the "Restructuring") pursuant to the Banking Law, attaching a "Draft Plan of Restructuring of Liabilities & Recapitalization of Alliance Bank" to the application.

27.      As noted, the Kazakhstan Court granted the application in the Kazakhstan Decision on March 3, 2014, commencing the Kazakhstan Proceeding and appointing me as the person responsible for the Restructuring and as foreign representative in respect of the Bank. The Kazakhstan Decision resulted in an automatic stay on enforcement of all relevant claims of

the Bank's creditors and protection of the Bank's property from execution and attachment until

completion of the Restructuring.

28.    The Debtor published notice of the Kazakhstan Decision of March 3, 2014 on

March 8, 2014 in both the Kazakh and Russian languages in the papers <u>Yegemen Kazakhstan</u>

and <u>Kazakhstanskaya Pravda</u>, respectively.    In addition, notice was sent directly to the

Correspondent Banks (as defined below) on March 6, 2014.[8]

29.    As part of the Kazakhstan Decision, the Kazakhstan Court ordered that:

a.    the Restructuring of the Bank must be completed by July 1, 2014
(although the Bank has obtained an extension of this deadline through January 30,
2015[9]);

b.    I should be responsible for conducting the Restructuring and the creditors'
meetings and should preside over the creditors' meetings;

c.    I should be the "foreign representative" for purposes of recognition of the
Restructuring and restructuring-related procedures outside Kazakhstan;

d.    the proceeding should be recognized as a judicial proceeding conducted in
accordance with the insolvency legislation of the Republic of Kazakhstan in which
the Bank's activity is subject to supervision by the National Bank of the Republic of
Kazakhstan;

e.    the Bank should undertake various actions to notify and inform its
creditors and other interested parties in relation to steps being taken pursuant to the
Restructuring, including publishing an information memorandum detailing the debts
subject to the Restructuring;

f.    the Bank should duly convene a meeting of the creditors to approve a
restructuring plan;

g.    previous court decisions regarding claims against the Bank and the claims
of creditors whose liabilities are to be restructured should be suspended; and

---

[8] Notice was also sent to the following banks where the Bank maintains correspondent accounts outside of the
United States: Commerzbank AG, Deutsche Bank, OJSC Savings Bank of Russia, OJSC VTB Banks, OJSC Finance
Credit Bank, OJSC PromsvyazBank, OJSC Russlavbank, JSC AB Bank of China Kazakhstan, Subsidiary Bank of
OJSC Savings Bank of Russia, JSC Kazkommertsbank, JSC TemirBank, JSC Bank Centercredit and JSC BTA
Bank.
[9] A certified copy of the order of the Kazakhstan Court extending the deadline to complete the Restructuring and an
English translation thereof is attached hereto as Exhibit E.

h.       execution or attachment upon the property of the Bank is not permitted.

30.    As noted <u>supra</u> in footnote 3, pursuant to the Decree of the President of the Republic of Kazakhstan dated April 4, 2014, the Specialized Financial Court of Almaty was abolished and its powers were transferred to the Kazakhstan Court.  Accordingly, although the Kazakhstan Proceeding was initiated in the Specialized Financial Court of Almaty, it is now pending in the Kazakhstan Court.

**E.       The Restructuring Plan and the Proposed Consolidation**

31.    On February 10, 2014, a steering committee of creditors (the "<u>Steering Committee</u>") was formed and on April 7, 2014, was formally appointed by the Bank to conduct restructuring negotiations with the Bank.  The Steering Committee members are Greylock Capital, LIM Advisors, VR Capital, J.P. Morgan and Pioneer Investments.  Houlihan Lokey and Dechert LLP advise the Steering Committee.

32.    On May 15, 2014, Mr. Bulat Utemuratov ("<u>Mr. Utemuratov</u>"), a Kazakhstan businessman and a major shareholder in a number of Kazakhstan financial institutions, acquired 16% of the common shares and preference shares in the Bank from Samruk-Kazyna.

33.    On August 1, 2014, following several months of negotiations and due diligence by the Steering Committee and its advisors, the Bank and the Steering Committee reached a non-binding agreement on the financial terms of the restructuring of the Bank's liabilities.  The parties recognized that the recapitalization of the Bank on a stand-alone basis would not have been sufficient to restore the Bank's capital to a sustainable IFRS Tier 1 ratio as required by the Bank's regulators.  Moreover, a stand-alone capitalization would have required significantly higher write-offs from existing creditors and increased contribution from Samruk-Kazyna to enable the Bank to operate on a sound basis.  Accordingly, the agreement with the Steering Committee was premised on the integration of the Bank with two other Kazakhstan banks,

Temirbank and ForteBank, in each of which Mr. Utemuratov owns the controlling majority interests.[10]

34.    The non-binding agreement with the Steering Committee was memorialized in the Bank's definitive restructuring plan (the "Restructuring Plan"), which, as described below, remains subject to approval by the Bank's regulators and the Kazakhstan Court.  The key elements of the Restructuring Plan are summarized in the following paragraphs.

**1.        The Consolidation of the Bank with Temirbank and ForteBank**

35.    As noted above, the Restructuring Plan is premised on the Bank's consolidation with two other Kazakhstan banks controlled by Mr. Utemuratov, Temirbank and ForteBank (when considered as consolidated with the Debtor, the "Combined Bank").  The primary purpose of the consolidation is to contribute Temirbank's and ForteBank's capital surplus to the restoration of the Bank's regulatory capital.  Indeed, as of June 30, 2014, the IFRS Tier 1 ratio of the Combined Bank on a pro-forma basis would have been approximately 20% – a level meaningfully above the regulatory minimum and consistent with its main Kazakhstan peers. Moreover, the Combined Bank will hold a strong competitive position within Kazakhstan's banking sector.  For instance, as of September 1, 2014, the Combined Bank would have ranked, on a pro-forma basis, seventh among Kazakhstan's banks by net loans, third by equity, eighth by total assets and eighth by total deposits.

36.    In addition to creating material cost and operational synergies, the consolidation will also generate important tax synergies, primarily due to the creation of KZT 19.5 billion in deferred tax assets and the ability to use the Bank's existing off-balance sheet deferred tax

---

[10] Mr. Utemuratov owns 91.49% of the common shares and 7.61% of the preference shares in Temirbank, and 80.85% of the common shares of ForteBank.  I own the remaining 19.14% of the common shares of ForteBank. Verny Investments Holding LLP, an investment group I founded, holds all outstanding preference shares of ForteBank. Various shareholders hold the remaining common and preference shares of Temirbank.

attributes.  Moreover, the partial use of such deferred tax attributes will result in no tax being

payable on the Bank's restructuring gain resulting from the Restructuring Plan in 2014 (which

represents an approximate aggregate tax savings of KZT 12.5 billion that would likely not have

been available in the absence of the consolidation).  The consolidation is also expected to

improve the Combined Bank's financial profile and future profitability, thus allowing for the use

of additional deferred tax attributes.  While the Combined Bank will face material upfront

integration costs of the consolidation, such as increased network and information technology

expenditures, such costs are expected to be offset by overall synergies within three years of the

closing of the consolidation.

### 2.        The Equity Interests in the Combined Bank

37.    The Bank, Temirbank and ForteBank will be consolidated into the Combined Bank

at their respective book values of equity, as adjusted to reflect each bank's contribution of tax

attributes to the Combined Bank.  Under this proposed structure, shareholders of Temirbank are

expected to receive 64.24% of the Combined Bank's common shares, shareholders of ForteBank

are expected to receive 25.42% of the Combined Bank's common shares, and (mostly new)

shareholders of the Bank are expected to receive 10.34% of the Combined Bank's common

shares and 100% of the Combined Bank's preferences shares.

38.    As a result, the proposed shareholdings of the Combined Bank as of the closing of

the Restructuring (as calculated as of October 13, 2014) are expected to be: (i) Mr. Utemuratov

owning 76.47% of the common shares and 20.02% of the preference shares, (ii) the claimants of

the Bank owning 10.32% of the common shares (as described in the next paragraph); (iii) my

holding of 4.68% of the common shares, (iv) Samruk-Kazyna holding .01% of the common

shares and 51.00% of the preference shares, and (v) other shareholders of Temirbank and

ForteBank holding the remaining minority of common shares. Existing shareholders of the Bank are expected to have their common shares diluted below .01% and to own 28.98% of the preference shares.

39.    Pursuant to the Restructuring Plan, the common shares available to claimants of the Bank (i.e., 9,966,484,918 common shares in the Combined Bank or approximately 10.3% of the Combined Bank's common shares on a pro-forma basis as of June 30, 2014) will be made available to holders of Discount Notes, Par Notes and Subordinated Tenge B Notes. The holders of such Notes may, subject to certain exceptions, elect to receive global depository receipts ("GDRs") instead of common shares in the Combined Bank. One such GDR is expected to represent 500 common shares, which shares will be transferred to and held by a depositary on the GDR holders' behalf.

40.    Claimants of the Bank receiving shares or GDRs in the Combined Bank under the Restructuring Plan will benefit from minority shareholder rights, including tag-along rights in respect of share disposals of Mr. Utemuratov, the right to nominate an independent director with a clear majority of GDR holders and protections under Kazakhstan law, such as protective requirements for related-party transactions, mandatory offer rules and a requirement for one-third of the board of directors to consist of independent directors.

**3.        The New Senior Notes**

41.    Pursuant to the Restructuring Plan, in addition to their distributions of common shares, holders of Discount Notes and Par Notes will receive new 10-year senior notes issued by the Combined Bank (the "New Senior Notes") in the total nominal amount of US$ 236,570,000, with an annual 11.75% coupon payable in cash semi-annually. Principal on the New Senior Notes will be paid in 16 semi-annual installments starting on the date 30 months after closing.

The New Senior Notes will be governed by English law and listed on the Kazakhstan and Luxembourg Stock Exchanges.

**4.        Elections Available to Noteholders**

42.    Pursuant to the Restructuring Plan and subject to certain limitations, holders of Par Notes, Discount Notes and Subordinated Tenge B Notes may elect to exchange all or a part of their equity consideration for New Senior Notes or vice versa.  Moreover, holders of Par Notes, Discount Notes and Subordinated Tenge B Notes may elect to exchange all or a portion of their equity consideration for cash.  The amount of equity eligible for such cash exchange will be limited to 40% of the overall equity allocated to the existing holders of Par Notes, Discount Notes and Subordinated Tenge B Notes.  Subject to the above limit, electing holders of Subordinated Tenge B Notes will be allocated cash for their equity on a priority basis.

**5.        Cash Payments**

43.    Holders of Discount Notes, Par Notes and Recovery Notes will also receive certain other cash distributions as provided for in the Restructuring Plan.

**6.        The Samruk-Kazyna Deposits**

44.    The Restructuring Plan also calls for a contribution by Samruk-Kazyna of special term deposits in the amount of KZT 220 billion (i.e., approximately US$ 1.22 billion) (the "New SK Deposit"). The New SK Deposit has a 10-year maturity with a bullet repayment and bears a 4% interest rate with interest paid in cash semi-annually. Samruk-Kazyna's contribution will be accomplished primarily through the conversion of its deposits at the Bank, Temirbank and ForteBank.  Holders of the New Senior Notes will be protected against an early withdrawal of Samruk-Kazyna's deposits by a covenant in the documents governing the New Senior Notes.

**F.**     **Creditor and Shareholder Plan Approval Process**

    **1.**     **The Information Memorandum**

      45.    The Bank published an information memorandum dated October 13, 2014, in connection with the restructuring (as amended and supplemented, the "Information Memorandum").  The Information Memorandum is attached hereto as Exhibit F.  The Bank's proposed Restructuring Plan is set forth in Schedule 1 to the Information Memorandum beginning at page 178 and is attached hereto as Exhibit G.  The Information Memorandum contains a detailed presentation of the terms of the Restructuring Plan, the risk factors associated with the Restructuring Plan, the proposed consolidation of the Bank with Temirbank and ForteBank, and a description of all procedures to be taken by the Bank's creditors and shareholders to approve (or disapprove) the Restructuring Plan and the consolidation.  The Information Memorandum was made available to interested parties (subject to certain limitations arising from applicable securities laws) on the Bank's website.

    **2.**     **The Claimants' and Noteholders' Meetings**

      46.    A meeting of creditors whose debts are being restructured under the Restructuring Plan (such creditors, the "Claimants," such claims, the "Claims," and such meeting, the "Claimants' Meeting") was held on November 19, 2014.  In accordance with Kazakhstan law, the Claimants attending the Claimants' Meeting (either in person or by proxy) voted, as a single class, on whether to approve the Restructuring Plan.  The Claimants overwhelmingly approved the Restructuring Plan by 90.5% of the amount of Claims voted at such meeting.  Thus, the voting results on the Restructuring Plan far surpassed the creditor consent threshold of two-thirds (2/3) of all Claims voted required under Kazakhstan law.

      47.    Prior to the Claimants' Meeting, each series of Notes issued by the Bank held its own respective meeting (each a "Noteholders' Meeting") regarding the approval of the

Restructuring Plan.  Such Noteholders' Meetings were convened on October 31, 2014 but were adjourned until November 14, 2014 for failure to satisfy the quorum thresholds set forth in the Trust Deed.

48.    At each adjourned Noteholders' Meeting, the holders of the respective series of Notes were asked to consider and, if thought fit, pass (either in person or by proxy through a direction to the clearing systems or their applicable custodians or securities brokers) an extraordinary resolution in respect of such series (each an "Extraordinary Resolution"), that, among other things, instructed the Trustee for such series of Notes to vote the full amount of the claims with respect to such series at the Claimants' Meeting in favor of the Restructuring Plan.[11] Pursuant to the Trust Deed, the Extraordinary Resolution with respect to a series of Notes required (i) the affirmative vote of 75% of the nominal amount of such Notes voting at the Noteholders' Meeting and (ii) that the applicable quorum has been satisfied (i.e., 75% of the outstanding Notes at the first Noteholders' meeting or 25% of the outstanding Notes at the adjourned Noteholders' Meeting).  To the extent an Extraordinary Resolution was not adopted, the votes of the Noteholders in such series were treated as individual Claimants' votes for purposes of the voting on the Restructuring Plan at the Claimants' Meeting.

49.    At the adjourned Noteholders' Meetings, the voting holders of Tenge Discount Notes, Dollar Discount Notes, Dollar Par Notes and Recovery Notes authorized the respective Extraordinary Resolutions with 100%, 97.1%, 99.2% and 99.0% (by amount) voting in favor. Accordingly, the Trustees for such tranches of Notes voted the full principal amount of such Notes in favor of the Restructuring Plan at the Claimants' Meeting.

---

[11] As explained further below, the Extraordinary Resolution also authorizes the Trustee, upon approval of the Restructuring Plan by the Kazakhstan Court, to, among other things, release the Bank and Samruk-Kazyna and certain other third parties with respect to the liabilities restructured under the Restructuring Plan, the SK Undertaking and the implementation of the Restructuring Plan.

50.    The holders of Subordinated Tenge B Notes did not pass the Extraordinary Resolution at their Noteholder Meeting. (Noteholders holding 34.7% in principal amount of the Notes voting at such meeting voted in favor of the Extraordinary Resolution and 65.3% against.) As a result, the Trustee for the Subordinated Tenge B Notes did not vote at the Claimants' Meeting, and the votes cast by holders of Subordinated Tenge B Notes at the adjourned Noteholders' Meeting in favor of or against the Extraordinary Resolution were automatically deemed to be voted in favor of or against the Restructuring Plan at the Claimants' Meeting according to how they were cast at their Noteholders' Meeting.

51.    No holders of Tenge Par Notes appeared or voted at the adjourned Noteholders' Meeting.  As a result, no holders of the Tenge Par Notes were deemed to have voted at the Claimants' Meeting, and no such holders otherwise voted at the Claimants' Meeting.

52.    Notice of the Claimants' Meeting was set out at Schedule 3 of the Information Memorandum at page 192.  Notices of the Claimants' Meeting were published in the Financial Times (in English) on October 14, 2014, The Wall Street Journal (in English) on October 15, 2014,  Kazakhstanskaya Pravda (in Russian) on October 18, 2014, and Yegemen Kazakhstan (in Kazakh) on October 18, 2014.  Notice of such meeting was also sent to the Kazakhstan Stock Exchange on October 17, 2014 and posted on the Bank's corporate website on October 13, 2014.

53.    The owners of the Notes were also notified of the Noteholders' Meetings through notices distributed through Euroclear and Clearstream.  The notices of the Noteholders' Meetings included a reference to the Information Memorandum which, in turn, included notice of the Claimants' Meeting.  Notices of the Noteholders' Meetings are set out in Schedule 5 of the Information Memorandum at pages 196-256.

3.        **Shareholder Approvals**

54.    A joint general shareholders' meeting of the Bank, Temirbank and ForteBank was held on November 10, 2014, wherein the shareholders of the Bank approved the Restructuring Plan, and shareholders of each respective bank approved the proposed consolidation of the three banks and other ancillary matters necessary for the completion of the Restructuring and consolidation.  The resolution approving the Bank's Restructuring Plan was passed by 99.74% of the voting common shares and preference shares of the Bank.[12]  The resolution approving the proposed consolidation of the three banks was passed by 99.98%, 100% and 100% of the voting shares of the Bank, ForteBank and Temirbank, respectively.[13]  Shareholders at the joint general shareholders' meeting were permitted to vote in person or by proxy.  Notices of such meeting were published on the website of the Kazakhstan Stock Exchange and the corporate websites of the Bank, Temirbank and Fortebank on October 10, 2014.  The Bank of New York Mellon, in its capacity as the GDR depository, also sent a proxy form to shareholders holding GDRs and initiated a corporate event in the clearing systems with respect to the shareholders' meeting. Further, such form of notice of shareholders' meeting is set out in Schedule 6 of the Information Memorandum at pages 257-258.

**G.    Regulatory and Court Approval Process**

55.    On November 20, 2014, the Bank submitted the Restructuring Plan to the National Bank of Kazakhstan for its approval and a determination that it is consistent with the indicative restructuring recapitalization plan initially considered by the National Bank of Kazakhstan on

---

[12] In accordance with applicable Kazakhstan law, the holders of preference shares and common shares voted as a single class, with each share having one vote.

[13] Pursuant to the Bank's charter, some of the resolutions requested of the shareholders of the Bank required at least 75% of voting shares.  Moreover, pursuant to the SK Undertaking, the resolutions approving the Restructuring Plan, the consolidation and the amendment to the SK Undertaking required the consent of at least four shareholders holding at least 75% of the Bank's common shares, which approval was in each case obtained.

March 3, 2014.  The Bank has submitted the proposed consolidation to the Kazakhstan

competition agency for its approval.  The National Bank of Kazakhstan and the Kazakhstan

competition agency are each expected to rule on the approval of the Restructuring Plan and the

proposed consolidation by December 11, 2014.

56.     The Kazakhstan Court's final hearing regarding whether to approve the

Restructuring Plan is scheduled for December 11, 2014, and a notice thereof will be given on or

about November 20, 2014 by publication of a press release on the Bank's website and on the

website of the Kazakhstan Stock Exchange.  In addition, the Bank will email the press release to

the email addresses of the Trustee (with the request that it be sent through the clearing systems to

Noteholders) and to Samruk-Kazyna.  All Claimants are allowed to submit written objections

and evidence and to be heard at the final hearing.  If the Kazakhstan Court decides to approve the

Restructuring Plan (such decision, the "Approval Decision"), parties in interest opposed to such

decision would be afforded an opportunity to appeal the decision.  If the Restructuring Plan is

approved by the Kazakhstan Court, the Bank intends to issue common shares to shareholders of

Temirbank and ForteBank in accordance with the Restructuring Plan and receive transferred

shares in Temirbank and ForteBank on December 12, 2014, and to distribute Entitlements

beginning on December 15, 2014.

## H.        Effect of the Approval Decision

57.     Upon the Kazakhstan Court issuance of the Approval Decision, the Restructuring

Plan will become binding on Claimants and the Bank.  Restructuring Plan at §§ 2.1 and 2.4.

Upon the Steering Committee notifying the Bank that the conditions precedent to the

Restructuring Plan becoming effective have been satisfied (the date on which this occurs, the

"Restructuring Date" or the "Release Date"), the Restructuring Plan will be implemented and

Claimants will receive any distributions (the "Entitlements") to which they are entitled under the Restructuring Plan.  Restructuring Plan at § 2.7.

58.     On the Release Date, all debts and Claims held by Samruk-Kazyna and the Notes that issued Extraordinary Resolutions will be discharged and/or cancelled.  Restructuring Plan at § 3.1(a).

59.     In consideration for the Entitlements provided by the Bank and the contributions by Samruk-Kazyna to the Bank contemplated under the Restructuring Plan, the Restructuring Plan also provides for Claimants to affirmatively release their Claims against the Bank as well as claims against certain third parties with the mechanisms for doing so differing among the different categories of Designated Financial Indebtedness (as defined in the Information Memorandum).

60.     Clause 3.5 of the Restructuring Plan sets out the release mechanisms for Noteholders.  For those holders of a series of Notes that passed an Extraordinary Resolution in accordance with the terms of the Trust Deed (which is governed by English law), the Trustee will be authorized and directed, from the Restructuring Date, to execute a deed of release (the "Deed of Release") on behalf of all Noteholders of those series.  Restructuring Plan at § 3.5(a). As noted above, the holders of Dollar Discount Notes, Tenge Discount Notes, Dollar Par Notes and Recovery Notes each approved such Extraordinary Resolutions on November 14, 2014. Accordingly, purely as a matter of English contractual law, the Trustees for such series of Notes will execute the Deed of Release on behalf of all such Noteholders on the Restructuring Date.

61.     Where holders of a series of Notes did not pass an Extraordinary Resolution (as was the case for the Subordinated Tenge B and the Tenge Par Notes), the Restructuring Plan contemplates that, in order to be eligible to receive Entitlements in accordance with the

Restructuring Plan, the relevant Noteholders will be required to approve an Extraordinary

Resolution at a separate meeting of Noteholders, cancelling the relevant series of Notes and

authorizing the Trustee to enter into the Deed of Release on behalf of such Noteholders.

Restructuring Plan at § 3.5(b)(i).  Noteholders of such series that fail to do so within three years

from the Restructuring Date will lose their rights to Entitlements under the Restructuring Plan.

Restructuring Plan at § 3.2(d).  However, such Noteholders will retain their rights vis-à-vis the

Released Parties (as defined below) other than (i) the Bank and (ii) Samruk-Kazyna with regard

to liabilities relating to the SK Undertaking.[14]

62.    The release mechanism for Samruk-Kazyna is outlined in Clause 3.6 of the

Restructuring Plan.  Such clause contemplates that, in respect of the SK Deposits, Samruk-

Kazyna will execute a separate Deed of Release prior to the Restructuring Date in order to

receive its Entitlements under the Restructuring Plan.  Samruk-Kazyna expressed its support for

the Restructuring Plan by filing a Claim Form and a Proxy Form instructing the Chairman of the

Claimants' Meeting to vote in favor of the Restructuring Plan on its behalf.

63.    The Deed of Release delivered by the respective Trustees for the Notes and

Samruk-Kazyna releases, with effect from the Release Date, (i) the Bank, (ii) the Bank's

subsidiaries, (iii) Samruk-Kazyna, (iv) the officers and directors of the Bank and Samruk-

Kazyna, (v) the Steering Committee and (vi) the financial and legal advisors of the Bank and the

Steering Committee (collectively, the "Released Parties") from all claims and liabilities the

Trustees, the releasing Noteholders or Samruk-Kazyna may have, whether in law or equity,

---

[14] Pursuant to the resolution passed by the Banks' shareholders at the joint general shareholders' meeting, the majority of the provisions of the SK Undertaking have been terminated pursuant to the terms of that agreement.  As a result, only the tag-along rights contained in that agreement remain outstanding for so long as Samruk-Kazyna owns shares in the Bank.  In consideration for the New SK Deposit that Samruk-Kazyna is providing the Bank under the Restructuring Plan (i.e., long-term deposits exceeding US$1 billion), the SK Undertaking will be terminated in full and Samruk-Kazyna and all other persons will be released from any liability to the Claimants thereunder. Restructuring Plan at § 6.

against each and all of the Released Parties arising out of or in connection with the Designated

Financial Indebtedness and/or the SK Undertaking and/or the implementation of the

Restructuring, except for any liabilities involving gross negligence, fraud or wilful misconduct.

The form Deed of Release is attached to the Information Memorandum at page 185.

**I.      Effect of the Kazakhstan Court order terminating the Kazakhstan
Proceeding**

64.    Once the Restructuring Date has occurred, the Bank will report this to the National

Bank of the Republic of Kazakhstan, which in turn will apply to the Kazakhstan Court to

terminate the Kazakhstan Proceeding.  If the Kazakhstan Court enters an order terminating the

Kazakhstan Proceeding (such order, the "Termination Order"), which it is entitled to do if

actions envisaged by the Restructuring Plan have been implemented, then, upon the Termination

Order coming into force (such date, the "Effective Date"), the Bank's liabilities included in the

Restructuring Plan will have been considered as fulfilled as a matter of Kazakhstan restructuring

law (as distinguished from the contractual release of the Bank and the Released Parties under the

Deed of Release), and enforcement proceedings in relation to decisions of courts, arbitration and

referee tribunals on such liabilities shall be deemed terminated by operation of the Banking Law.

Under Kazakhstan law, the Termination Order will come into force after a 15 day appeal period

has passed.  Essentially any party in interest may object to entry of, or appeal the relief granted

in, the Termination Order.

65.    Claimants are also obliged to discontinue any proceedings against the Bank to

recover or to establish the amounts or existence of any Designated Financial Indebtedness.

Restructuring Plan at § 3.7.

66.    While Kazakhstan law does not provide for a stay of actions relating to restructured

debt upon termination of the restructuring proceedings, the above provisions of the Restructuring

Plan mean that former creditors whose debts were subject to the Restructuring Plan will no longer be able to bring successful actions in Kazakhstan in relation to such debts, as they will have been considered as satisfied, and enforcement of existing judgments in relation to them will be prohibited.

67.    The Restructuring Plan itself does not become binding upon creditors who did not submit Claim Forms in the Kazakhstan Proceeding until the Effective Date, at which point the claims of all creditors of the Bank whose claims against the Bank were subject to the Restructuring Plan, including those of creditors who did not submit Claim Forms, are cancelled and discharged by operation of law.

**J.    Connections to the United States and Need for Chapter 15 Relief**

68.    Although the Bank has no branch, agency or other place of business, or directors, officers or employees in the United States, the Bank does have correspondent accounts (the "Correspondent Accounts") located in New York County, New York with the Bank of New York Mellon, JPMorgan Chase & Co. and Deutsche Bank Trust Company Americas (the "Correspondent Banks").  The Correspondent Accounts have been established for many years, and the Bank makes payments through its Correspondent Accounts in the ordinary course of its day-to-day banking business.  The balances of the Correspondent Accounts fluctuate frequently as business is transacted, but as of the date hereof, the Correspondent Accounts had a total aggregate balance of over $5,000,000.

69.    The Bank maintains a website which is accessible from the United States and has identified a process agent in New York for purposes of the USA Patriot Act, namely CT Corporation System.  Further, the Bank believes certain of its financial creditors are financial institutions located in the United States, and a small number of the Bank's depositors are residents of the United States.

70.    The purpose of the relief requested in this Petition is to ensure that creditors of the Bank (or those claiming through them) are not able to use American courts to circumvent the effect of the Kazakhstan Proceeding and the Restructuring Plan approved by the Kazakhstan Court, for example by seeking to attach and garnish funds in the Correspondent Accounts. Though the Bank is not now a party to any litigation in the United States and I am unaware of any specific threats, obtaining this Court's recognition of the Kazakhstan Proceeding, together with the related relief requested herein, will likely be critical to the success of the Restructuring, including implementation of the Restructuring Plan.

71.    While I am not at this time seeking provisional relief, I reserve my right to do so.

## K.    Ancillary UK Proceeding

72.    The Bank also has various links to the United Kingdom.  Among other things, the Notes (which constitute a major part of the Designated Financial Indebtedness) are governed by English law.  Moreover, the Trust Deed in respect of the Notes is also governed by English law, and disputes related to it may be referred to arbitration before the London Court of International Arbitration in London.  The Bank also maintains correspondent accounts with banks in the United Kingdom.

73.    To protect the Bank's assets in the United Kingdom, I obtained an order (the "UK Recognition Order") from the UK Court dated April 29, 2014, recognizing the Kazakhstan Proceeding as a foreign main proceeding in accordance with the Model Law as set out in Schedule 1 to the UK Cross-Border Insolvency Regulations 2006, and granting a stay under Article 20(1) of Schedule 1 to the Cross-Border Insolvency Regulations 2006.  A copy of the UK Recognition Order is attached to hereto as Exhibit H.  The Bank is also seeking an order from the UK Court granting a permanent stay of actions or proceedings or executions against the assets of the Bank in relation to claims based on or arising out of or in connection with the Designated

Financial Indebtedness being restructured, such stay to continue notwithstanding the termination

of the restructuring proceedings pending with respect to the Bank in Kazakhstan.

## STATEMENT PURSUANT TO
## SECTION 1515(c) OF THE BANKRUPTCY CODE

74.    I am informed that section 1515(c) of the Bankruptcy Code provides that "[a]

petition for recognition shall also be accompanied by a statement identifying all foreign

proceedings with respect to the debtor that are known to the foreign representative."

75.    In compliance with section 1515(c), I hereby declare that the only foreign

proceedings (as such term is defined in section 101(23) of the Bankruptcy Code) pending with

respect to the Bank that are known to me are: (i) the Kazakhstan Proceeding, and (ii) the

Ancillary UK Proceeding.

## LIST PURSUANT TO
## BANKRUPTCY RULE 1007(a)(4)

76.    I am informed that Federal Rule of Bankruptcy Procedure 1007(a)(4) provides as

follows:

> In addition to the documents required under § 1515 of the Code, a foreign
> representative filing a petition for recognition under chapter 15 shall file with the
> petition: (A) a corporate ownership statement containing the information
> described in Rule 7007.1; and (B) unless the court orders otherwise, a list
> containing the names and addresses of all persons or bodies authorized to
> administer foreign proceedings of the debtor, all parties to litigation pending in
> the United States in which the debtor is a party at the time of the filing of the
> petition, and all entities against whom provisional relief is being sought under
> § 1519 of the Code.

77.    In compliance with Interim Bankruptcy Rule 1007(a)(4), I hereby provide the

following lists:

## Corporate Ownership Statement

78.    Pursuant to Federal Rule of Bankruptcy Procedure 7007.1, the following

corporations directly or indirectly own 10 percent or more of the Debtor's equity interests:

- Samruk-Kazyna

- Mr. Bulat Utemuratov - 16%

79.     Pursuant to Local Bankruptcy Rule 1007-3, the Debtor does not directly or indirectly own 10 percent or more of any class of any corporation's equity interests that are publicly traded securities.  Further, pursuant to Local Bankruptcy Rule 1007-3, the Debtor owns equity interests in the following general or limited partnerships or joint ventures:  (i) First Credit Bureau LLP (approximately 18.7% of the equity interests), OUSA Alliance LLP (100% of the equity interests) and Alliance Finance OJSC (100% of the equity interests).  See Local Bankruptcy Rule 1007-3.

### Administrators in the Kazakhstan Proceeding and the UK Ancillary Proceeding

80.     Kazakhstan Proceeding:  I, Timur Rizabekovich Issatayev, Ushkonyr St. 10, Kuramys Village, Almaty City, Republic of Kazakhstan, was declared authorized by the Kazakhstan Court to act as foreign representative for the purposes of Chapter 15 proceedings in the United States pursuant to the Kazakhstan Decision.

81.     UK Ancillary Proceeding:  I, Timur Rizabekovich Issatayev, Ushkonyr St. 10, Kuramys Village, Almaty City, Republic of Kazakhstan, was declared also authorized by the Kazakhstan Court to act as the administrator for the purposes of UK Ancillary Proceeding pursuant to the Kazakhstan Decision.

### Parties to Litigation in the United States

82.     As of the date of this Declaration, the Bank is not a party to any litigation pending in the United States of which I am aware.

### Entities Against Whom Provisional Relief is Sought under Section 1519

83.     Neither the Bank nor I am currently seeking any provisional relief, but each of us

reserves the right to do so should the need arise.

I declare under penalty of perjury under the laws of the United States of America that the

foregoing is true and correct.

Dated: November 20, 2014
Almaty, Kazakhstan

_/s/ Timur Rizabekovich Issatayev_

Timur Rizabekovich Issatayev

JSC Alliance Bank
50 Furmanov Street
Almaty 050004
Republic of Kazakhstan